# 24-1880-cv

-------------------------------------------------------------------

# United States Court of Appeals

## *for the*

## Second Circuit

-------------------------------

MURPHY MEDICAL ASSOCIATES, LLC;
DIAGNOSTIC AND MEDICAL SPECIALISTS
OF GREENWICH, LLC; and STEVEN A.R.
MURPHY, M.D,

*Plaintiffs-Appellants,*

– v –

1199SEIU NATIONAL BENEFIT FUND,

*Defendant-Appellee.*

-------------------------

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF NEW
YORK

_____

## BRIEF FOR PLAINTIFFS-APPELLANTS
_____

ROY W. BREITENBACH
HARRIS BEACH PLLC
*Attorneys for Plaintiffs-Appellants*
333 Earle Ovington Boulevard
Uniondale, New York 11553
(516) 880-848

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ ii

RULE 26.1 DISCLOSURE STATEMENT ........................................................................ 1

JURISDICTIONAL STATEMENT .................................................................................... 2

STATEMENT OF THE ISSUES PRESENTED ............................................................... 3

STATEMENT OF THE CASE ........................................................................................... 4

SUMMARY OF THE ARGUMENT ................................................................................. 6

STATEMENT OF FACTS ................................................................................................. 9

ARGUMENT .................................................................................................................... 19

The Amended Complaint Sufficiently Alleged Satisfaction Of The Exhaustion Of
Administrative Remedies Requirement .......................................................... 19

CONCLUSION ................................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Berger v. Edgewater Steel Co.*,
911 F.2d 911 (3d Cir. 1990) .......................................................... 22

*Diagnostic Affiliates of Northeast Houston, LLC v. United Healthcare Servs.*,
2022 U.S. Dist. LEXIS 14132 (S.D. Tex. Jan. 19, 2022) ............................ 21-22

*Hernandez v. United States*,
939 F.3d 191 (2d Cir. 2019) ............................................................ 2

*Kennedy v. Empire Blue Cross and Blue Shield*,
989 F.2d 588 (2d Cir. 1993) ......................................................... 19, 20

*Levi v. RSM McGladrey, Inc.*,
12-cv-8787, 2014 U.S. Dist. LEXIS 134662 ......................................... 18

*Montefiore Med. Ctr. v. Loc. 272 Welfare Fund*,
No. 09-cv-3096, 2018 U.S. Dist. LEXIS 28019 *29 (S.D.N.Y. Feb. 20, 2018) (S.D.N.Y. Feb. 20, 2018) ......................................................................... 21

*Murphy Med. Assocs., LLC v. United Med. Res. Inc.*,
2023 U.S. Dist. LEXIS 53636 ........................................................ 20

*Murphy v. Cigna*,
2022 U.S. Dist. LEXIS 43351 ........................................................ 20

*Neurological Surgery*, P.C. *v. Siemens Corp.*,
17-cv- 3477, 2017 U.S. Dist. LEXIS 206010 ........................................ 18

*Paese v. Hartford Life Accident Ins. Co.*,
449 F.3d 435 (2d Cir. 2006) ........................................................ 18, 19

*Pani v. Empire Blue Cross Blue Shield*,
152 F. 3d. 67 (2d Cir. 1998) ........................................................ 19

*Rozek v. New York Blood Ctr.*,
925 F. Supp. 2d 315 (E.D.N.Y. 2013) ............................................... 18

*Sibley-Schreiber v. Oxford Health Plans, Inc.*,
62 F. Supp. 2d 979 (E.D.N.Y. 1999) ............................................... 19, 22

**Statutes**

28 U.S.C. § 1291 ......................................................................... 1

28 U.S.C. § 1331 ......................................................................... 1

29 U.S.C. § 1132 ..................................................................... 16, 3, 5

**Rules**

Fed. R. App. P. 4 ................................................................................................ 1

Fed. R. App. P. 32 .............................................................................................. 24

Fed. R. Civ. P. 12 .............................................................................................. 3

**Other**

29 C.F.R. § 2560.503-1 ...................................................................................... 21

## **RULE 26.1 DISCLOSURE STATEMENT**

Plaintiffs-Appellants Murphy Medical Associates, LLC and Diagnostic and Medical Specialists of Greenwich, LLC state that neither of them has any parent company, and no publicly held corporation owns 10% or more of their stock.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331 and 1343 because this action arises under the laws of the United States. Judgment was entered on June 12, 2024. JA.760. Plaintiffs-Appellants then timely filed this appeal in accordance with Fed. R. App. P. 4(a)(1)(A) on July 11, 2024. JA.761. This Court therefore has jurisdiction under 28 U.S.C. § 1291.

## **STATEMENT OF THE ISSUES PRESENTED**

This appeal from the district court's judgment dated June 12, 2024, JA.761, raises the following issue: Whether the District Court in its June 12, 2024 Order (Ho, J.) properly dismissed Plaintiff's amended complaint with prejudice? The District Court's decision is reported at 2024 WL 2978406. The standard of review is de novo. *See Hernandez v. United States*, 939 F.3d 191 (2d Cir. 2019).

## <u>STATEMENT OF THE CASE</u>

Plaintiffs-Appellants (the "Murphy Practice"), medical practices and their principal physician, also operate a physician-owned laboratory. During the COVID-19 pandemic, the Practice opened drive-through COVID-19 testing sites throughout southern Connecticut and New York. Many of these sites were opened at the request of various Connecticut cities, towns, and institutions. At these sites, the Murphy Practice provided COVID-19 testing and related services to enrollees of Defendant-Appellee's ("1199's") health plans.

In this action, the Murphy Practice seeks damages in the amount of $576,153 from 1199 due to its failure to reimburse the Practice for the services provided. The amended complaint asserts a single cause of action for ERISA benefits under 29 U.S.C. § 1132(a)(1)(B), JA.

On June 12, 2024, the district court (Ho, J.) issued a memorandum opinion and order granting 1199's Fed. R. Civ. P. 12(b)(6) motion to dismiss. JA.747. This dismissal was with prejudice, and the district court denied the Murphy Practice leave to serve an amended complaint.

Relevant to this appeal, the district court dismissed the amended complaint finding that the Murphy Practice, in its amended complaint, failed to allege sufficient

facts to establish that it exhausted its administrative remedies regarding the claims at issue before suing, or that exhaustion would be futile. JA.757-59.

On June 12, 2024, the district court clerk entered judgment in favor of 1199. JA.760. On July 11, 2024, the Murphy Practice filed its notice of appeal. JA.761

## SUMMARY OF THE ARGUMENT

In this action, the Murphy Practice has alleged that it provided COVID-19 testing and related services to 1199 health plan enrollees and sought reimbursement of over $500,000 million for these services. Although the Murphy Practice was not a participating provider in the 1199 health plans, the Families First Coronavirus Response Act and the CARES Act – enacted by Congress in March 2020 to respond to the growing pandemic crisis – *mandate* that health plans such as 1199's plans directly reimburse out-of-network providers such as the Murphy Practice for providing COVID-19 testing and related services to their enrollees. The Acts further *mandate* that the plans reimburse providers for these services without regard for cost sharing, prior authorization, or other medical management requirements. Finally, the CARES Act establishes the reimbursement rate that out-of-network providers are to receive for these services.

Notwithstanding that the Murphy Practice provided these essential services to its enrollees, 1199 breached its obligations necessitating this lawsuit. As discussed above, the amended complaint asserts a single cause of action seeking ERISA benefits under 29 U.S.C. § 1132(a)(1)(B). Obtaining assignments of benefits from the patients at issue who were 1199 enrollees, the Murphy Practice sues to enforce the terms of the health plan documents which, by operation of law, have been deemed to override, or functionally amend and supplement the terms of ERISA-

6

governed (and other ) health plan documents. *See Murphy Medical Assocs. v. Cigna*, 2022 U.S. Dist. LEXIS 43351, at *20 (D. Conn. Mar. 11, 2022) ("the reimbursement obligation derives from the Coronavirus Legislation, which effectively modified the terms of ERISA plans to provide SARS-CoV-2 tests at no cost to a patient."); *Open MRI & Imaging of RP Vestibular Diagnostics, P.A.*, 2022 U.S. Dist. LEXIS 89593, *12 (D.N.J. May 18, 2022) ("Congress explicitly required ERISA-regulated plans—*expressly defined as such*—to provide this COVID-related coverage. The [FFCRA], by imposing this COVID testing coverage requirement on plans as defined by ERISA, made it an ERISA requirement.")

Thus, regardless of what ERISA plan documents provide, or do not provide, regarding the coverage of COVID-19 testing and related services, the plans must cover those services in accordance with FFCRA's terms. This is true even if the services were rendered by out-of-network providers and the plan, by its terms, does not cover out-of-network services. And, these out-of-network providers must be directly reimbursed at the rates established by the CARES Act, regardless of what the plan provides.

The district court dismissed this lawsuit, finding that the amended complaint failed to establish that the Murphy Practice had exhausted its administrative remedies with 1199 before bringing suit or, alternatively, that exhaustion was futile.

As we explain in detail below, the district court's decision is legally incorrect for a number of reasons, each of which warrant reversal by this Court.

First, under relevant case law, Murphy Practice has no affirmative obligation to establish exhaustion or futility in its amended complaint; it is an affirmative defense. Once raised, however, the Murphy Practice's obligation is simply to plead enough facts to demonstrate that exhaustion or futility is plausible on its face.

Here, at the very least, the Murphy Practice has alleged that any attempt to exhaust administrative remedies would have been futile. This is based on detailed allegations regarding 1199's failure to inform the Murphy Practice as to the appropriate appeal process; its reflexively automatic denial of claims, and its improper use of medical necessity denials in violation of FFCRA, the CARES Act, and the ERISA claim regulation. For these reasons, this Court should reverse the district court and reinstate the ERISA benefits claim.

## STATEMENT OF FACTS

Plaintiff Murphy Medical Associates LLC is a limited liability company organized under Connecticut law. (Plaintiff Diagnostic and Medical Specialists of Greenwich, LLC is a limited liability company organized under Connecticut law. Plaintiff Steven A.R. Murphy, M.D. is a physician licensed to practice medicine in Connecticut and New York. JA.14-15.

The Murphy Practice specializes in general medical care, personalized medicine and genetics, weight loss medicine, adolescent care, and hereditary cancers. Among its other services, the Murphy Practice operates a state-licensed physician office laboratory). Dr. Murphy is the certified laboratory director for this laboratory under the federal Clinical Laboratory Improvement Amendments ("CLIA") and Connecticut law. From the start of the COVID-19 pandemic in March 2020, the Murphy Practice offered COVID-19 testing for the detection of the virus that causes COVID-19. JA.14-19.

Defendant is a multi-employer trust fund established in accordance with Section 186(c) of the Labor Management Relations Act of 1947, as well as an "employee welfare benefit plan" as that term is defined in ERISA. The Fund provides comprehensive medical, prescription, dental, and vision benefits to its members, who are working and retired healthcare industry workers in the 1199SEIU

9

UnitedHealthcare Workers East union and their families. As a Self-Funded Plan, the Fund acts in a role similar to commercial health insurers by reimbursing providers for services provided to patients covered by the Fund's health plans. The Murphy Practice is out-of-network with the Fund, which means it does not have a contract with the Fund to accept discounted rates of services provided to members of the Fund's health plans.). JA.15.

In early 2020, the COVID-19 pandemic quickly set upon the United States. On March 15, 2020, Governor Lamont shut down the state of Connecticut to all non-essential business. Days later, on March 20, 2020, Governor Cuomo shut down the state of New York to all non-essential business by enacting the PAUSE Act. Widespread testing for COVID-19 quickly became a first line of defense in controlling the spread of the virus and keeping the population safe from COVID-19. In those earliest days of the pandemic, there was a glaring shortage of available COVID-19 testing centers. In response, the Murphy Practice began focusing its resources on combatting COVID-19 by offering testing services 7 days a week to quickly and accurately diagnose COVID-19 and provide patients with timely results. While businesses, including many healthcare providers, shut down during the heart of the pandemic, the Murphy Practice remained open and conducted testing on more than 35,000 individuals for COVID-19 and gave them results as efficiently as

possible, all the while absorbing increased operational costs and risking the health and safety of its employees. JA.18-20.

The Murphy Practice's herculean efforts were successful in establishing drive and/or walk-through COVID-19 testing sites in Greenwich, Stamford, New Canaan, Darien, Fairfield, Bridgeport, New Haven, West Haven and Stratford, Connecticut, and Bedford, Brooklyn, and Pound Ridge, New York. Aside from the physical infrastructure, the Murphy Practice also had to develop extensive protocols and procedures to ensure that each site was safely operating in line with all federal, state and local guidance. JA.18-20.

The Murphy Practice went above the minimum of just providing COVID-19 testing. The Murphy Practice invested significant hours and resources researching peer-reviewed and other expert literature to determine the most effective and informative way to fulfill its COVID-19 testing mission. To properly treat a patient, other diagnostic testing was required. Patients who presented with symptoms of COVID-19 or who potentially have exposure to COVID-19 need to be tested for COVID-19 and other respiratory viruses and infections that could cause the same or similar symptoms as COVID-19. This information about other potential respiratory issues is vitally important to ensure that patients who present with symptoms or were

11

possibly exposed to COVID-19 receive the most appropriate and effective treatment for a life-threatening condition. JA.19-20.

Initially, the Murphy Practice lacked the capacity to perform COVID-19 testing in its lab. As a moderately complex lab, the Murphy Practice, initially, only had the capacity to utilize certain tests. Although the Practice had state-of-the art testing for most respiratory illnesses in the form of a BioFire Film Array machine, COVID-19 testing was not included. Due to the difficulty in securing the aforementioned testing kits, early on, the Murphy Practice retrieved samples at its testing centers and sent them to outside labs for analysis. JA.20-21.

Continuing with its mission to provide the best and most comprehensive care, in May of 2020, the Murphy Practice purchased an advanced BioFire Film Array System with COVID-19 testing capability. (Compl. ¶ 39). According to the makers of BioFire, "[t]he inclusion of SARS-CoV-2 in the BIOFIRE® RP2.1 panel allows healthcare providers to quickly identify patients with common respiratory pathogens, as well as those with COVID-19, using one simple test. The BIOFIRE® RP2.1 panel takes approximately 45 minutes and tests nasopharyngeal swab samples in transport media." (Id.) Once the Murphy Practice had COVID-19 testing capacity through the BioFire machines, patients who were symptomatic or otherwise required

12

expedited results had their samples run through BioFire, which often provided them with results in one day or less. JA.21-22.

When the results of the tests were available, they were posted on the patient's registration portal. In the event of a positive test, a telemedicine visit was scheduled with the patient to review the results and discuss the next steps with a clinician. (Id.) Despite the Fund's claims to the contrary, the Murphy Practice has received accolades for its public health efforts from federal and state elected representatives, local government officials, and the media. JA.21-22.

"Due to the urgent need to help facilitate the nation's response to the public health emergency posed by COVID-19," Congress and the President took an extraordinary step in enacting the FFCRA and the CARES Act. Together, the FFCRA and the CARES Act addressed the critical need to make COVID-19 testing widespread and readily available and to mandate that health plans and insurance companies cover COVID-19 testing and related services and reimburse providers for providing these services. JA.23-25.

Specifically, Section 6001 of the FFCRA requires group health plans and health insurance issuers to provide coverage for COVID-19 testing without imposing any cost-sharing requirements (including deductibles, copayments, and insurance), prior authorization, or other medical management requirements. Id. ¶ 10; see also

13

FAQs, Parts 43 and 44. Under federal law, not only must health plans and health insurers cover COVID-19 testing, but they must also make it easy for patients to get tested and remove financial and other barriers that would deter patients from getting tested. In addition, the CARES Act amendments to the FFCRA ensure that providers—whether in-network or out-of-network—will be paid for providing COVID-19 testing. See FAQs, Parts 43 and 44; see also CARES Act § 3202(a)(2). Further, the CARES Act amendments to the FFCRA require group health plans and health insurance issuers offering group or individual health insurance to cover (without cost-sharing) any COVID-19 testing and related services within 15 days of recommendation. See CARES Act § 3203(a); CARES Act § 3203(b)(2). JA23-25.

Typically, a self-insured health plan issuer, like the Fund, dissuades its members from seeking services from out-of-network providers and encourages its members to seek care from in-network providers with whom there is a contract for reduced reimbursement rates. But Congress and the President, in enacting section 3202(a)(2) of the CARES Act, provided a specific reimbursement methodology by which health plans and health insurers must pay any provider for COVID-19 testing: they must reimburse any provider of COVID-19 diagnostic testing "an amount that equals the negotiated rate or, if the plan or issuers does not have a negotiated rate with the provider, the cash price for such services that is listed by the provider on a public website." FAQs, Parts 43 and 44; see also CARES Act § 3202(a)(2). In order

14

to encourage widespread testing to minimize transmission, the federal government sought to greatly simplify the processes for getting tested and for ensuring that all providers get paid for providing the tests.

In addition to reimbursing providers for the COVID-19 tests, health insurers must reimburse providers for other related tests, items, and services furnished during a visit that results in an order for a COVID-19 or COVID-19 antibody test. Finally, the CDC has specifically expressed its approval of tests that, like the BioFire Array, screen patients for influenza variants, along with COVID-19. JA.23-25.

The Fund's obligations under the FFCRA and the CARES Act have been clear throughout the course of the pandemic. The Fund made no effort to negotiate a rate with the Murphy Practice for COVID-19 testing and related services that the Murphy Practice provided to its members. Thus, under federal law, the Fund must reimburse the Murphy Practice for the cash price listed on its public website, which was $1,500.

Under the Fund's view, its obligation was limited to reimbursing the Murphy Practice for COVID-19 testing conducted on symptomatic members of the Fund's health plans. The Fund is misplaced. Glaringly absent from the Legislation was any distinction between testing symptomatic or asymptomatic individuals. That is because, as common-sense dictates, an individual who is asymptomatic and returns to work or school without a test can equally spread the virus in the same manner that

a symptomatic individual would. In fact, members of Congress have sought to clarify this issue by writing letters to HHS clarifying the intent behind the Legislation. These letters, written in response to the increase in coverage denials for asymptomatic individuals, urged HHS to "to take immediate action to clarify the obligations of group health plans and insurers to provide robust and comprehensive coverage of COVID-19 testing," instead of "giving insurance companies loopholes" to comply with these coverage mandates. These Congressional letters cautioned that Congressional intent was being frustrated due to an increase in coverage denials from health plans for COVID-19 testing. The mandatory payment provisions of the CARES Act were an indispensable part of the Congress' goal to "harness the strength and innovation of the private sector" to ensure widespread availability of tests, "regardless of whether the individual is symptomatic." JA.23-25.

Adding insult to injury, rather than honor its legal obligations in this time of global pandemic, the Fund has instead embarked on a campaign of deception to shirk its reimbursement obligation under federal law. The Murphy Practice has been advised that it provided testing to the Fund's members who were instructed by claims representatives to withhold health plan information when submitting to the Murphy Practice for testing. With no insurance card, or any other method to obtain this information, those claims had to be submitted to HRSA's COVID-19 Uninsured Program for reimbursement. Moreover, the Fund has also engaged the Murphy

16

Practice in a paperwork war of attrition. Specifically, the Fund has made voluminous frivolous and bad faith medical records and audit requests in response to virtually every claim submitted by the Murphy PracticeThe Fund's practices are expressly prohibited under federal law from applying medical management requirements (such as medical records reviews) to COVID-19 testing and related services claims. The Fund does not even attempt to hide their contravention of the CARES Act and preauthorization requirements for molecular laboratory testing in its Summary Plan Descriptions, attached to the Fund's motion.

Indeed, guidance from federal government makes this point abundantly clear." Despite this guidance, the Fund continues to thumb its nose at federal law. Out of the 497 COVID-19 tests and services administered, the Fund has reimbursed the Murphy Practice at a rate of 10% of its billed charges. Currently, the Fund owes $576,153.00 to the Murphy Practice for COVID-19 testing and related services conducted on its members.

ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B) permits a plan participant or beneficiary a private right of action to bring a civil action to recover plan benefits, enforce his or her rights under the plan, or clarify the right to future benefits. ERISA § 502(3), 29 U.S.C. § 1132(a)(3) further permits a plan participant or beneficiary to seek to "enjoin any act or practice which violates any provision" of ERISA or the

17

terms of the plan, or "to obtain other appropriate equitable relief" to "redress such violations or . . . enforce any provisions" of ERISA.

## **ARGUMENT**

**The Amended Complaint Sufficiently Alleged Satisfaction Of The Exhaustion Of Administrative Remedies Requirement**

As discussed above, the district court based its dismissal on its finding that the amended complaint failed to establish exhaustion of administrative remedies in the context of its ERISA benefits claim. JA.747. This is wrong.

Under this Court's jurisprudence, "a failure to exhaust ERISA administrative remedies is not jurisdictional but is an affirmative defense." *Paese v. Hartford Life Accident Ins. Co.*, 449 F.3d 435, 446 (2d Cir. 2006); *see Neurological Surgery, P.C. v. Siemens Corp.*, 17-cv- 3477, 2017 U.S. Dist. LEXIS 206010, *17 (E.D.N.Y. Dec. 12, 2017). Because it is an affirmative defense – and not part of a *prima facie* claim for plan benefits – courts within this Circuit have repeatedly held that "it is the Defendant's burden to prove that the Plaintiffs failed to exhaust their administrative remedies." *Siemens*, 2017 U.S. Dist. LEXIS, at *21; *see Levi v. RSM McGladrey, Inc.*, 12-cv-8787, 2014 U.S. Dist. LEXIS 134662, *31 (S.D.N.Y. Sept. 24, 2014). Indeed, because the burden of proving the failure to exhaust rests with the defendant, an ERISA plaintiff is not even required to plead that it exhausted its administrative remedies. *See Rozek v. New York Blood Ctr.*, 925 F. Supp. 2d 315, 342 (E.D.N.Y. 2013); *White v. Univ. of Rochester, Strong Mem'l Hosp.*, 12-cv-6288, 2012 WL 3598210, at *3 (W.D.N.Y. Aug. 20, 2012).

Although "an affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) . . . if the defense appears on the face of the complaint" *Pani v. Empire Blue Cross Blue Shield,* 152 F. 3d. 67, 74 (2d Cir 1998), that is not the case here.

Here, the amended complaint contains detailed allegations establishing that exhaustion would have been futile. "The exhaustion doctrine . . . does not require plaintiffs to 'engage in meaningless acts or to needlessly squander resources as a prerequisite to commencing litigation.'" Sibley-Schreiber v. Oxford Health Plans, Inc. , 62 F. Supp. 2d 979, 986 (E.D.N.Y. 1999). As such, "a court will release the claimant from the requirement" where the claimant "make[s] a 'clear and positive showing' that pursuing available administrative remedies would be futile." *Kennedy v. Empire Blue Cross and Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993).

A plaintiff makes a clear and positive showing of futility where, as here, the defendant ignores plaintiff's appeals. *Siemens*, 2017 U.S. Dist. LEXIS, at *22 (citing *Sibley-Schreiber*, 62 F. Supp. 2d at 987). This Court has recognized a "firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases." *Paese*, 449 F.3d 435, 443 (2d Cir. 2006). The purpose of the exhaustion requirement is to "help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a non-adversarial method of claims settlement; and to minimize the costs of claims settlement for all

20

concerned." *Kennedy*, 989 F.2d at 594 (2d Cir. 1993). However, where a plaintiff's participation in a formal administrative process is futile, these purposes are no longer served, and "a court will release the claimant from the requirement." *Id.* Where, as here, a plaintiff alleges it faced widespread automatic denials of claims, it is hard to contemplate how the purposes of exhaustion could be effectively served. *See Murphy v. Cigna*, 2022 U.S. Dist. LEXIS 43351, at *9 ("Plaintiff encountered such massive, repeated, and automatic denials, it would be futile for it to administratively exhaust each individual claim with any expectation of successful result."); *see also Murphy Med. Assocs., LLC v. United Med. Res. Inc.*, 2023 U.S. Dist. LEXIS 53636 (D. Conn. Mar, 29, 2023) (denying motion to dismiss on the same basis).

Here, the Murphy Practice sufficiently alleges that exhaustion would have been futile in its extensive and well-pled amended complaint. JA.35-37. As an initial point, the explanations of payment that 1199 provided the Murphy Practice in connection with the claims do not provide any information regarding administrative exhaustion processes. While the district court attempted to explain this away because, it stated, 1199's obligations regarding administrative exhaustion are owed to its enrollees, not the Murphy Practice, this finding ignores that what are at issue here are COVID-19 testing claims covered by the provisions of FFCRA and the CARES Act.

As discussed above, FFCRA and the CARES Act mandate that health plans such as 1199 reimburse out-of-network providers, such as the Murphy Practice, *directly* for COVID-19 testing and related services. Thus, at the very least, the Murphy Practice falls within the definition of a claimant and is entitled to receive notice of the plan's appeal and review procedures. *See* 26 C.F.R. § 2560.503-1(g)(1)(iv). This violation of the ERISA claim regulation, alone, warranted a finding of futility because, if a plan fails to "follow claims procedures consistent with the requirements of [29 C.F.R. § 2560.503-1], a claimant shall be deemed to have exhausted the administrative remedies available under the plan and shall be entitled to pursue any available remedies under section 502(a)." 29 C.F.R. § 2560.503-1(l)(1*)." Montefiore Med. Ctr. v. Loc. 272 Welfare Fund,* No. 09-cv-3096, 2018 U.S. Dist. LEXIS 28019 *29 (S.D.N.Y. Feb. 20, 2018). As the amended complaint alleges, however, 1199 engaged in more improper conduct, including attempting to persuade enrollees not to provide their plan information to the Murphy Practice so as to enable the Practice to submit a plan claim. JA.35-36.

Moreover, the amended complaint alleges that 1199's reimbursement rate for claims was only 10%, despite the Murphy Practice providing all supporting documentation needed to process and reimburse the claims. *Id.* This, too, supports a finding of futility. *See Diagnostic Affiliates of Northeast Houston, LLC v. United Healthcare Servs.*, 2022 U.S. Dist. LEXIS 14132, at *33 (S.D. Tex. Jan. 19, 2022)

22

(plaintiff demonstrated futility to withstand a motion to dismiss where almost all but a "very small fraction of the hundreds of claims" were denied).

Likewise, exhaustion is deemed futile excused when the denials are based on a general policy of denying all applications for a specific plan. *Sibley-Schreiber*, 62 F. Supp. 2d at 986 (citing Berger v. Edgewater Steel Co., 911 F.2d 911, 917 (3d Cir. 1990)). As alleged in the amended complaint, 1199 took the blanket position that it will not reimburse COVID-19 testing claims for employment, return to work or for administrative reasons. In this context, Courts have excused exhaustion and will not require "insureds to jump through procedural hoops on their way to an inevitable denial of coverage." *Sibley-Schreiber*, 62 F. Supp. 2d. at 988.

Moreover, as alleged in the amended complaint, many of the denials were for vague and reflexive reasons of lack of medical necessity. Such denials are in violation of the CARES Act and FFCRA, which, as discussed above, require the reimbursement of COVID-19 testing notwithstanding medical management requirements. JA.35-37. And, under the ERISA regulations, "if the adverse benefit determination is based on medical necessity," 1199 was required to provide "an explanation of the…clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances…" 26 C.F.R. § 2560.503-1(g)(1)(v)(B). This requirement was not satisfied.

For all these reasons, the Murphy Practice has alleged sufficient facts rendering it plausible that the exhaustion of administrative remedies requirements was satisfied through a clear and positive showing of futility.

## **CONCLUSION**

For all the reasons set forth above, this Court should reverse the judgment of the district court, and award Plaintiffs-Appellants such other and further relief that the Court deems just and proper.

Dated:      September 12, 2024
                Uniondale, New York

                                      HARRIS BEACH PLLC
                                      *Attorneys for Plaintiffs-Appellees*

By:_____
                                        Roy W. Breitenbach
                                        333 Earle Ovington Boulevard
                                        Uniondale, New York 11553
                                        (516) 880-8484
                                        rbreitenbach@harrisbeach.com

## **CERTIFICATE OF COMPLIANCE**

This document complies with the word limit of Second Circuit Local Rule 32.1(a)(1)(A) because, excluded the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,504 words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in Times New Roman Size 14 font.

Dated:      June 20, 2024
               Uniondale, New York

                             HARRIS BEACH PLLC
                             *Attorneys for Plaintiffs-Appellees*

By:_____
                             Roy W. Breitenbach
                             333 Earle Ovington Boulevard
                             Uniondale, New York 11553
                             (516) 880-8484
                             rbreitenbach@harrisbeach.com

# 24-1880-cv

--------------------------------------------------------------------

## United States Court of Appeals

### *for the*

### Second Circuit

-------------------------------

MURPHY MEDICAL ASSOCIATES, LLC;
DIAGNOSTIC AND MEDICAL SPECIALISTS
OF GREENWICH, LLC; and STEVEN A.R.
MURPHY, M.D,

*Plaintiffs-Appellants,*

– v –

1199SEIU NATIONAL BENEFIT FUND,

*Defendant-Appellee.*

--------------------------

ON APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF NEW
YORK

_____

## SPECIAL APPENDIX TO BRIEF FOR
## PLAINTIFFS-APPELLANTS

_____

ROY W. BREITENBACH
HARRIS BEACH PLLC
*Attorneys for Plaintiffs-Appellants*
333 Earle Ovington Boulevard
Uniondale, New York 11553
(516) 880-8484

# Table of Contents

Memorandum Opinion and Order.pdf ............................................................................................. SA-1

Clerk's Judgment.pdf ..................................................................................................................... SA-14

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MURPHY MEDICAL ASSOCIATES, LLC, et al.,

　　　　　　　　　　Plaintiffs,

v.

1199SEIU NATIONAL BENEFIT FUND,

　　　　　　　　　　Defendant.

---

23 Civ. 6237 (DEH)

**<u>MEMORANDUM OPINION AND ORDER</u>**

---

DALE E. HO, United States District Judge:

　　This case involves the alleged failure by the 1199SEIU National Benefit Fund ("the Fund" or "Defendant") to pay Plaintiffs Murphy Medical Associates, LLC, Diagnostic and Medical Specialists of Greenwich, LLC, and Steven A.R. Murphy ("Murphy Medical" or "Plaintiffs") for COVID-19 testing they performed for the Fund's members. For the reasons discussed herein, Defendant's Motion to Dismiss, ECF No. 64, is **GRANTED**.

## BACKGROUND

### I.　　Procedural History

　　On January 13, 2022, Plaintiffs filed their original Complaint in the District of Connecticut, and on April 17, 2022, Defendant filed its first Motion to Dismiss. *See* ECF No. 1, 17. On July 25, 2022, the Court held oral argument on Defendant's fully briefed motion, which it granted in full on March 24, 2023. *See* ECF Nos. 44, 48. However, it dismissed one of Plaintiffs' claims without prejudice and permitted Plaintiffs to amend their pleadings, instructing them either to "include allegations regarding the manner in which Murphy Medical has exhausted its administrative remedies or [plausibly allege] the factual bases for a claim that it should be excused from doing so." *See Murphy Med. Assocs., LLC v. 1199SEIU Nat'l Benefit Fund*, No. 22 Civ. 64, 2023 WL 2631811, at *5 (D. Conn. Mar. 24, 2023). The Court further

advised Plaintiffs "that if an Amended Complaint is filed, the Court will issue an Order to Show

Cause as to why this matter should not be transferred to either the Southern or Eastern Districts

of New York by virtue of the forum selection provisions of the Fund's Plan." *Id.* at *7.

On May 15, 2023, Plaintiffs filed their Amended Complaint, *see* Am. Compl., ECF No.

51, and in lieu of answering, Defendant filed the Motion to Dismiss now before the Court, *see*

ECF No. 64.

On May 31, 2023, the Court ordered Plaintiffs "to show cause before June 30, 2023 as to

why venue in the District of Connecticut is proper." ECF No. 54. On June 27, 2023, Plaintiffs

consented to transfer, *see* ECF No. 55, and this case was transferred to this District on July 19,

2023, *see* July 19, 2023 Min. Entry. This case was reassigned to the undersigned on October 20,

2023. *See* Oct. 20, 2023 Min. Entry.

## II.    Factual Background

The Court assumes familiarity with the background facts of this case, which are

summarized further by the Order granting Defendant's first motion to dismiss. *See Murphy Med.*

*Assocs.*, 2023 WL 2631811. The following additional facts, which are drawn from Plaintiffs'

Amended Complaint and documents incorporated by reference therein, are relevant to—and

assumed to be true for the purposes of—this motion. *See Buon v. Spindler*, 65 F.4th 64, 69 n.1

(2d Cir. 2023).[1]

### A. Allegations Against the Fund

Plaintiffs' allegations against the Fund broadly fall within one of the following three

categories.

---

[1] In all quotations from cases, the Court omits citations, footnotes, emphases, internal quotation
marks, brackets, and ellipses unless otherwise indicated. All references to Rules are to the
Federal Rules of Civil Procedure.

***Failure to Explain the Fund's Administrative Appeals Process***.  Plaintiffs attach to their Amended Complaint examples of Explanations of Payment ("EOPs") sent to them by the Fund. These EOPs did not justify the denial of payments to Murphy Medical, and they "did not provide any detailed instruction regarding an administrative appeal process."  Am. Compl. ¶¶ 109-12. After Plaintiffs followed up with the Fund and provided further documentation, Defendant continued to decline to justify the claim denials.  *See id*. ¶¶ 113-15.  These correspondences did not communicate that there was an additional appeal process.  *See id.* ¶ 116.

***Failure to Pay in Full or Timely Respond to Plaintiffs' Claims***.  Plaintiffs allege that after they provided Fund members with "covered and medically necessary services," and "timely and properly submitted claims for reimbursement to the Fund," the Fund did "not pay the claims at all, pa[id] the claims at a far reduced amount, or ignore[d] the very submission of the claims." *See id.* ¶¶ 96-97.  Plaintiffs allege that Defendant's failure to timely respond to Plaintiffs' claims violated the Employee Retirement Income Security Act of 1974 ("ERISA") regulation requiring plan administrators to notify claimants of a plan's adverse benefit determination no later than 30 days after receipt of the claim.  *See id.* ¶ 99 (citing 29 C.F.R. § 2560.501-1 (f)(2)(iii)(B)).

***Concealing Information***.  Plaintiffs allege that the Fund "directed its members to conceal the Fund's health plan information from the Murphy Practice when presenting for COVID-19 testing or related services."  *Id.* ¶ 135.  Some members "admitted to Murphy Practice staff that the Fund had instructed them to not provide their respective health plan information."  *Id.* ¶ 137.

**B.  Exhaustion Provision**

Plaintiff incorporates by reference the Fund's Summary Plan Description ("SPD"), a guidebook for members that explains, *inter alia*, the process for appealing any adverse determination by the Fund.  *See id*. ¶¶ 107-08; *see also* Poulous Aff. Ex. A ("2015 SPD"), ECF No. 66-1.  The Plan describes the Fund's exhaustion policy as follows:

3

> **NOTE:** All claims by you, your spouse, your children or your beneficiaries against
> the Benefit Fund are subject to the Claims and Appeal procedure [described below].
> *No lawsuits may be filed until all steps of these procedures have been completed*
> *and the benefits requested have been denied in whole or in part.*

2015 SPD at 167 (emphasis added).[2]  As part of the Fund's "Appeals Procedure," before filing a

lawsuit, a Fund member seeking to dispute a "totally or partially denied" claim is instructed to

"request an Administrative Review of such denial within 180 days after the receipt of the denial

notice."  *Id.*  Next, if the Administrative Review also denies the claim in whole or in part, the

member has the right to "make a final appeal directly to the Appeals Committee of the [Fund's]

Board of Trustees."  *Id.* at 168.  Non-participating providers "do not have an independent right to

appeal an adverse benefit decision" on behalf of a Fund participant but may be authorized to do

so.  *Id.* at 169.  Any so-authorized non-participating provider "stand[s] in [the] shoes" of Fund

participants and is granted "no greater rights than" any other "participant appealing under the

terms of [the SPD]."  *Id.*

## LEGAL STANDARDS

To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient

factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009).  A claim will have "facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Id.*  This standard demands "more than a sheer possibility that a

defendant has acted unlawfully."  *Id.*

---

[2] All page numbers are in reference to ECF, and not internal, page numbers.  The 2020 and 2021
SPDs contain substantially the same information.  *See* ECF Nos. 66-2 to 66-3.  For ease of
reference, the Court cites only the 2015 SPD here.

In considering a motion to dismiss, a court must accept as true all well-pleaded facts alleged in the complaint and must draw all reasonable inferences in the plaintiff's favor. *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 237 (2d Cir. 2007). A complaint need not make "detailed factual allegations," but it must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 678. While all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Id.*

"The pleading requirements in the Federal Rules of Civil Procedure . . . do not compel a litigant to anticipate potential affirmative defenses . . . and to affirmatively plead facts in avoidance of such defenses." *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007). However, a motion to dismiss based on an affirmative defense is permissible "where the facts necessary to establish the defense are evident on the face of the complaint." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 199 (2d Cir. 2018).

A complaint is "deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). Even if a document is not incorporated in a complaint by reference, "the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010) (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)). In addition, a court may consider matters of which judicial notice may be taken on a Rule 12(b)(6) motion to dismiss. *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991).

# DISCUSSION

The previous decision in this case granting Defendant's first motion to dismiss cautioned that while Plaintiffs would be permitted to replead their ERISA claim, they were required to "include allegations regarding the manner in which Murphy Medical has exhausted its administrative remedies or [in the alternative, plausibly allege] the factual bases for a claim that it should be excused from doing so." *See Murphy Med. Assocs.*, 2023 WL 2631811, at *5. As discussed further below, Plaintiffs have not done so. Accordingly, Plaintiffs' last surviving claim is dismissed.

## A. Exhaustion of Administrative Remedies

Plaintiffs fail to plausibly allege that they exhausted administrative remedies prior to filing suit.

The administrative exhaustion "requirement was intended to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned." *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993). Given these important purposes, "the federal courts—including this Circuit—have recognized a firmly established federal policy favoring exhaustion of administrative remedies in ERISA cases." *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006). Under that policy, a plaintiff must pursue "those administrative [processes] provided for in the relevant plan or policy." *Kennedy*, 989 F.2d at 594. While the failure to exhaust administrative remedies is an affirmative defense, *see Paese*, 449 F.3d at 446, courts have nevertheless dismissed claims where plaintiffs fail to plead, or plead only in conclusory fashion, that they have exhausted their administrative remedies. *See Kesselman v. The Rawlings Co.*, 668 F. Supp. 2d 604, 608-09 (S.D.N.Y. 2009) (collecting cases); *see also Peppiatt v Aetna Life Ins.*

6

*Co.*, 2017 Civ. 2444, 2017 WL 6034641, at *5 (EDNY Dec. 4, 2017) ("[C]ourts routinely

dismiss ERISA claims . . . on a [Rule] 12(b)(6) motion to dismiss where the plaintiff fails to

plausibly allege exhaustion of remedies") (collecting cases).

      Here, following the Fund's denial of their claims, Plaintiffs, on behalf of Fund members,

were required to: (1) request an Administrative Review, and (2) if that review was unsuccessful,

appeal to the Fund's Board of Trustees Appeals Committee *before* filing suit in federal court.

*See* 2015 SPD at 1667-68.  The appeals process set forth by the Fund was not optional: the clear

terms of the Fund's policy state that "[n]o lawsuits may be filed *until all steps of these*

*procedures have been completed* and the benefits requested have been denied in whole or in

part." *Id.* at 167 (emphasis added).

      Nowhere in the Amended Complaint do Plaintiffs purport to have taken either of those

steps.  *See generally* Am. Compl.  Moreover, in their opposition brief, Plaintiffs do not dispute

Defendant's argument that Plaintiffs failed to take any step in the "Fund's delineated appeals

process."  Mem. of L. in Supp. of Def.'s Mot. to Dismiss Am. Compl. 10-12, ECF No. 67.  *See*

*generally* Pls.' Mem. of L. in Opp'n to Def.'s Mot. to Dismiss ("Pls.' Br."), ECF No. 72

(declining to refute Defendant's argument).  In so doing, Plaintiffs concede that they did not

exhaust administrative remedies prior to filing suit.  *Curry Mgmt. Corp. v. JPMorgan Chase*

*Bank, N.A.*, 643 F. Supp. 3d 421, 426 (S.D.N.Y. 2022) ("A party may be deemed to concede an

argument by failing to address it in an opposition brief.").

      Plaintiffs appear to suggest that by corresponding with the Fund following the Fund's

rejection of their claims, they in effect "appealed" every claim.  *See* Am. Compl. ¶¶ 117, 126

(describing Plaintiffs' correspondence with the Fund as an appeal of "every claim which the

Fund has either denied or partially reimbursed.").  But by merely following up with the Fund

about their claims, Plaintiffs did not exhaust any delineated step in the Fund's appeals process.

The "relevant plan or policy," *Kennedy*, 989 F.2d at 594, as set forth by the SPD, clearly outlined the Fund's appeals process, and Plaintiffs fail to allege that they attempted even the first step. *See generally* Am. Compl.

Finally, Plaintiffs allege without further elaboration that they have "appealed every claim submitted to the Fund, which were summarily denied." *Id.* at ¶ 5. While the Court must construe all of a plaintiff's allegations as true and resolve all inferences in the plaintiff's favor for the purposes of resolving a motion to dismiss, *see Porina v. Marward Shipping Co.*, 521 F.3d 122, 126 (2d Cir. 2008), Plaintiffs cannot meet their burden simply by relying on "conclusory statements without any supporting facts," *see Art Assure Ltd., LLC v. Artmentum GmbH*, No. 14 Civ. 3756, 2014 WL 5757545, at *2 (S.D.N.Y. Nov. 4, 2014). Plaintiffs have failed to plausibly allege that they exhausted administrative remedies before filing suit, as they were required to do.

While failure to exhaust administrative remedies is an "affirmative defense," here, it appears "on the face of the complaint," and thus warrants dismissal, as Plaintiffs "plead[] no facts suggesting any effort to exhaust the remedies *available through* [the applicable] *ERISA administrative plan*." *Neurological Surgery, P.C. v. Aetna Health Inc.*, 511 F. Supp. 3d 267, 295-96 (E.D.N.Y. 2021) (emphasis in original).

## B. Futility

Given their failure to exhaust, Plaintiffs must, in order to save their ERISA claims, plausibly allege that they were "excused from" following the Fund's administrative process. *See Murphy Med. Assocs.*, 2023 WL 2631811, at *5. As discussed below, they cannot.

Where a plaintiff makes a "clear and positive showing that pursuing available administrative remedies would be futile, the purposes behind the requirement of exhaustion are no longer served, and thus a court will release the claimant from the requirement." *Kennedy*, 989 F.2d at 594; *see also Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 219 (2d Cir. 2006)

8

("Unless a clear and positive showing is made that it would be futile for the claimant to pursue her claim through the internal claims process, that remedy must be exhausted prior to the institution of litigation.").  It bears emphasis, however, that "[t]he standard for demonstrating futility is very high." *Quigley v. Citigroup Supplemental Plan for Shearson Transfers*, 520 F. App'x 15 (2d Cir. 2013).  Far from making a "clear and positive showing," Plaintiffs rely on conclusory statements to attempt to demonstrate that it would have been futile to exhaust administrative remedies.  Even on a motion to dismiss, this cannot suffice.  *See Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The Court addresses Plaintiffs' primary arguments below.

   ***Failure to Explain the Fund's Administrative Appeals Process***.  Plaintiffs do not allege that the Fund does not inform *its members* of its exhaustion policy.  Nor can they; as discussed *supra*, the SPD clearly describes the process members must follow to appeal adverse decisions. *See* 2015 SPD at 1667-68.  Instead, Plaintiffs argue that the Fund did not include appeals information in the EOPs provided to Plaintiffs.  As a preliminary matter, the attached EOP is from the 1199SEIU Greater New York Benefit Fund, which is not a named Defendant in this action.  *See* Am. Compl. Ex. C at 2, ECF No. 51-3 (listing the name and address of 1199SEIU Greater New York Benefit Fund).  It is therefore not clear to the Court how this EOP is material to this action.  Assuming *arguendo* that it is, the Court is unaware of any authority to support a claim that an EOP's failure to describe a fund's appeals process somehow renders adherence to that appeals process futile.  *See Kesselman*, 668 F. Supp. 2d at 609 (declining to hold that the plaintiff's lack of awareness of the relevant plan excused her compliance with it, although the "plaintiff argue[d] that she was never told of her right and/or obligation to follow the detailed grievance procedure set forth in her plan.").

***Failure to Pay in Full or Timely Respond to Plaintiffs' Claims***.  Plaintiffs allege that the Fund's illegal non-compliance with ERISA claim procedures rendered exhaustion futile.  Pls.' Br. at 14-15.

Plaintiffs allege without any factual support that the Fund's denials of their claims were reflexive or automatic.  Am. Compl. ¶¶ 129, 155.  They undermine this claim by attaching an exhibit demonstrating that numerous claims were in fact *approved* and reimbursed by the Fund, as well as by attaching correspondence in which the Fund requests further documentation of members' claims as part of the Fund's review process.  *Id.*  Exs. A, D.  "Plaintiffs' conclusory allegation that any attempt at exhausting their administrative remedies would have been futile because of Defendants' blanket denial of the claims is . . . insufficient to withstand a motion to dismiss."  *Murphy Med. Assocs., LLC v. Yale Univ.*, No. 22 Civ. 33, 2024 WL 988162, at *3 (D. Conn. Mar. 7, 2024).

Plaintiffs also allege that Defendant "rarely, if ever" complied with ERISA's timeframes for processing its claims.  Am. Compl. ¶ 100.  Plaintiffs once again provide no factual support for this assertion.  Again assuming *arguendo* that Plaintiffs' attached EOP has any bearing on this case, Plaintiffs' reliance on it nonetheless fails to support this allegation, as the EOPs do not state the date the claims were received, which is when the clock starts on ERISA's mandated claim processing timeframes.  *See* 29 C.F.R. § 2560.503-1(f)(2)(iii)(B) ("In the case of a post-service claim, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, *but not later than 30 days after receipt of the claim.*") (emphasis added).

***Concealing Information***.  Plaintiffs allege that the Fund "actively instructed its members to conceal health insurance information from the Murphy Practice."  Pls.' Br. at 15.  It is unclear to the Court how this assertion, even if true, is relevant to whether it would be futile to follow the

10

appeals process outlined by the Fund.  Moreover, it is once again undermined by the Complaint

and its attachments, as members received SPDs—which in turn provided members with

information on how to submit a claim for reimbursement—and Plaintiffs provide documentation

that numerous claims were in fact submitted and processed.  *See generally* 2015 SPD; Am.

Compl. Ex. A, ECF No. 51-1.

Far from making a "clear and positive showing" that it would be futile to pursue their

claims through the Fund's internal claims process, *Eastman Kodak Co.*, 452 F.3d at 219,

Plaintiffs have "failed to allege any facts from which the Court might infer that [their] pursuit of

administrative remedies under the plan at issue would be futile."  *Kesselman*, 668 F. Supp. 2d at

609.  Accordingly, Plaintiffs were required to exhaust administrative remedies prior to filing suit,

and their failure to do so warrants dismissal.  *See Greifenberger v. Hartford Life Ins. Co.*, 131

Fed. App'x 756, 758 (2d Cir. 2005) (upholding dismissal of an ERISA § 502(a)(1)(B) claim for

failure to exhaust administrative remedies).

### C.  Plaintiffs' Alternative Arguments

Plaintiffs argue, without any support, that the SPD is somehow irrelevant, because the

Families First Coronavirus Response Act ("FFCRA") directed insurance companies to reimburse

providers of COVID-19 testing.  The Court is aware of no authority suggesting that the FFCRA

nullifies internal processes for appealing claims.  Moreover, the previous decision granting

Defendant's first motion to dismiss—which is law of the case—relied on the SPD in deciding

Defendant's first motion to dismiss, reflecting the Court's understanding that, far from being

irrelevant, the SPD's terms are dispositive as to whether administrative exhaustion is required.

*See Murphy Med. Assocs.*, 2023 WL 2631811, at *4; *cf. Delville v. Firmenich Inc.*, 23 F. Supp.

3d 414, 425 (S.D.N.Y. 2014) ("[W]hen a court has ruled on an issue, that decision should

generally be adhered to by that court in subsequent stages in the same case unless cogent and

compelling reasons militate otherwise."). Plaintiffs' attempt to salvage their ERISA claim with this alternative argument fails.

### D. Leave to Amend

Finally, Plaintiffs seek leave to amend their pleadings a second time. That request is denied. "Although leave to amend should be freely given 'when justice so requires,' it is 'within the sound discretion of the district court to grant or deny leave to amend.'" *Lopez v. Stop & Shop Supermkt. Co. LLC*, No. 19 Civ. 9913, 2020 WL 4194897, at *2 (S.D.N.Y. July 21, 2020) (quoting Fed. R. Civ. P. 15(a)(2) and *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)). Here, Plaintiffs decline to explain how they intend to cure any deficiencies with their pleadings. *See* Pls.' Br. 21 (requesting leave to amend without elaboration). As discussed throughout this opinion, Plaintiffs have already failed once to cure the original Complaint's deficiencies with respect to exhaustion. "A court may deny leave to amend where the plaintiff has already had the opportunity to amend its Complaint, and there is no indication that amendment would not be futile." *Champions League, Inc. v. Woodard*, 224 F. Supp. 3d 317, 326 (S.D.N.Y. 2016). Leave to amend is therefore properly denied here, as "granting leave to amend is unlikely to be productive." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129 (2d Cir. 1993).

## CONCLUSION

For the reasons set forth herein, Defendant's motion to dismiss Plaintiffs' Amended Complaint is **GRANTED**. Given Plaintiffs' failure to cure deficiencies already identified by the Court, their Amended Complaint is now dismissed with prejudice.

The Clerk of Court is directed to terminate ECF No. 64 and to close the case.

SO ORDERED.

12

SA-12

Dated: June 12, 2024
       New York, New York

_____

DALE E. HO
United States District Judge

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X
MURPHY MEDICAL ASSOCIATES, LLC, et al.,

                Plaintiffs,                  23 **CIVIL** 6237 (DEH)

       -against-                         **JUDGMENT**

1199SEIU NATIONAL BENEFIT FUND,

                Defendant.
------------------------------------------------------------------X

       It is hereby **ORDERED, ADJUDGED AND DECREED:**    That for the reasons

set forth in the Court's Memorandum Opinion and Order dated June 12, 2024, Defendant's

motion to dismiss Plaintiffs' Amended Complaint is GRANTED. Given Plaintiffs' failure to cure

deficiencies already identified by the Court, their Amended Complaint is now dismissed with

prejudice; accordingly, this case is closed.

**Dated:**  New York, New York
        June 12, 2024

                              **RUBY J. KRAJICK**
                             _____
                               **Clerk of Court**

                **BY:**      K. Mango

                               _____
                               **Deputy Clerk**



**United States District Court**
**Southern District of New York**

Ruby J. Krajick
*Clerk of Court*

Dear Litigant:

Enclosed is a copy of the judgment entered in your case. If you disagree with a judgment or final order of the district court, you may appeal to the United States Court of Appeals for the Second Circuit. To start this process, file a "Notice of Appeal" with this Court's Pro Se Intake Unit.

You must file your notice of appeal in this Court within 30 days after the judgment or order that you wish to appeal is entered on the Court's docket, or, if the United States or its officer or agency is a party, within 60 days after entry of the judgment or order. If you are unable to file your notice of appeal within the required time, you may make a motion for extension of time, but you must do so within 60 days from the date of entry of the judgment, or within 90 days if the United States or its officer or agency is a party, and you must show excusable neglect or good cause for your inability to file the notice of appeal by the deadline.

Please note that the notice of appeal is a *one-page* document containing your name, a description of the final order or judgment (or part thereof) being appealed, and the name of the court to which the appeal is taken (the Second Circuit) – *it does not* include your reasons or grounds for the appeal. Once your appeal is processed by the district court, your notice of appeal will be sent to the Court of Appeals and a Court of Appeals docket number will be assigned to your case. At that point, all further questions regarding your appeal must be directed to that court.

The filing fee for a notice of appeal is $605 payable in cash, by bank check, certified check, or money order, to "Clerk of Court, S.D.N.Y." *No personal checks are accepted.* Please see District Court fee schedule at https://www.nysd.uscourts.gov/programs/fees. If you are unable to pay the $605 filing fee, complete the "Motion to Proceed *in Forma Pauperis* on Appeal" form and submit it with your notice of appeal to the Pro Se Intake Unit. If the district court denies your motion to proceed *in forma pauperis* on appeal, or has certified under 28 U.S.C. § 1915(a)(3) that an appeal would not be taken in good faith, you may file a motion in the Court of Appeals for leave to appeal *in forma pauperis*, but you must do so within 30 days after service of the district court order that stated that you could not proceed *in forma pauperis* on appeal.

For additional issues regarding the time for filing a notice of appeal, see Federal Rule of Appellate Procedure 4(a). There are many other steps to beginning and proceeding with your appeal, but they are governed by the rules of the Second Circuit Court of Appeals and the Federal Rules of Appellate Procedure. For more information, visit the Second Circuit Court of Appeals website at **http://www.ca2.uscourts.gov/**.

THE DANIEL PATRICK MOYNIHAN
UNITED STATES COURTHOUSE
500 PEARL STREET
NEW YORK, NY 10007–1312

THE CHARLES L. BRIEANT, JR.
UNITED STATES COURTHOUSE
300 QUARROPAS STREET
WHITE PLAINS, NY 10601–4150

Rev. 5/23/14                                                                                          SA-15

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (    )(    )

## NOTICE OF APPEAL

Notice is hereby given that the following parties: _____

_____
(list the names of all parties who are filing an appeal)

in the above-named case appeal to the United States Court of Appeals for the Second Circuit

from the    ☐ judgment    ☐ order    entered on: _____
                                                   (date that judgment or order was entered on docket)

that: _____

_____
(If the appeal is from an order, provide a brief description above of the decision in the order.)

_____          _____
Dated                                      Signature*

_____
Name (Last, First, MI)

_____          _____
Address          City          State          Zip Code

_____          _____
Telephone Number                           E-mail Address (if available)

_____

* Each party filing the appeal must date and sign the Notice of Appeal and provide his or her mailing address and telephone number, EXCEPT that a signer of a pro se notice of appeal may sign for his or her spouse and minor children if they are parties to the case.  Fed. R. App. P. 3(c)(2).  Attach additional sheets of paper as necessary.

Rev. 12/23/13                                                           SA-16

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____
(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-

_____

_____
(List the full name(s) of the defendant(s)/respondent(s).)

_____CV_____ (      )(      )

## MOTION FOR EXTENSION OF TIME TO FILE NOTICE OF APPEAL

I move under Rule 4(a)(5) of the Federal Rules of Appellate Procedure for an extension of time to file a notice of appeal in this action. I would like to appeal the judgment entered in this action on _____ but did not file a notice of appeal within the required

                                              date

time period because:

_____

_____

_____
(Explain here the excusable neglect or good cause that led to your failure to file a timely notice of appeal.)

_____        _____
Dated:                                  Signature

_____
Name (Last, First, MI)

_____        _____        _____        _____
Address                        City             State           Zip Code

_____        _____
Telephone Number                E-mail Address (if available)

Rev. 3/27/15

SA-17

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

_____

_____                    _____CV_____ (       )(       )

(List the full name(s) of the plaintiff(s)/petitioner(s).)

-against-                               **MOTION FOR LEAVE TO
                                        PROCEED IN FORMA
_____   PAUPERIS ON APPEAL**

_____

(List the full name(s) of the defendant(s)/respondent(s).)


I move under Federal Rule of Appellate Procedure 24(a)(1) for leave to proceed *in forma*

*pauperis* on appeal. This motion is supported by the attached affidavit.


_____        _____
Dated                                   Signature

                                        _____
Name (Last, First, MI)

_____        _____
Address                        City     State                    Zip Code

_____        _____
Telephone Number                        E-mail Address (if available)

# Application to Appeal In Forma Pauperis

_____**v.**_____     Appeal No. _____

District Court or Agency No. _____

| Affidavit in Support of Motion | Instructions |
|---|---|
| I swear or affirm under penalty of perjury that, because of my poverty, I cannot prepay the docket fees of my appeal or post a bond for them. I believe I am entitled to redress. I swear or affirm under penalty of perjury under United States laws that my answers on this form are true and correct. (28 U.S.C. § 1746; 18 U.S.C. § 1621.)<br><br>Signed: _____ | Complete all questions in this application and then sign it.  Do not leave any blanks: if the answer to a question is "0," "none," or "not applicable (N/A)," write that response. If you need more space to answer a question or to explain your answer, attach a separate sheet of paper identified with your name, your case's docket number, and the question number.<br><br>Date: _____ |

My issues on appeal are: (<u>required</u>):

1.  _For both you and your spouse estimate the average amount of money received from each of the following sources during the past 12 months. Adjust any amount that was received weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate. Use gross amounts, that is, amounts before any deductions for taxes or otherwise._

| Income source | Average monthly amount during the past 12 months | | Amount expected next month | |
|---|---|---|---|---|
| | You | <u>Spouse</u> | You | <u>Spouse</u> |
| Employment | $ | $ | $ | $ |
| Self-employment | $ | $ | $ | $ |
| Income from real property (such as rental income) | $ | $ | $ | $ |

- 1 -

SA-19

| | | | | |
|---|---|---|---|---|
| Interest and dividends | $ | $ | $ | $ |
| Gifts | $ | $ | $ | $ |
| Alimony | $ | $ | $ | $ |
| Child support | $ | $ | $ | $ |
| Retirement (such as social security, pensions, annuities, insurance) | $ | $ | $ | $ |
| Disability (such as social security, insurance payments) | $ | $ | $ | $ |
| Unemployment payments | $ | $ | $ | $ |
| Public-assistance (such as welfare) | $ | $ | $ | $ |
| Other (specify): | $ | $ | $ | $ |
| **Total monthly income:** | **$ 0** | **$ 0** | **$ 0** | **$ 0** |

2.    *List your employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

3.    *List your spouse's employment history for the past two years, most recent employer first. (Gross monthly pay is before taxes or other deductions.)*

| Employer | Address | Dates of employment | Gross monthly pay |
|---|---|---|---|
| | | | $ |
| | | | $ |
| | | | $ |

SA-20

4.    *How much cash do you and your spouse have? $_____*

      *Below, state any money you or your spouse have in bank accounts or in any other financial institution.*

| Financial Institution | Type of Account | Amount you have | Amount your spouse has |
|---|---|---|---|
|  |  | $ | $ |
|  |  | $ | $ |
|  |  | $ | $ |

***If you are a prisoner seeking to appeal a judgment in a civil action or proceeding, you must attach a statement certified by the appropriate institutional officer showing all receipts, expenditures, and balances during the last six months in your institutional accounts.  If you have multiple accounts, perhaps because you have been in multiple institutions, attach one certified statement of each account.***

5.    *List the assets, and their values, which you own or your spouse owns. Do not list clothing and ordinary household furnishings.*

| Home | Other real estate | Motor vehicle #1 |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
|  |  | Make and year: |
|  |  | Model: |
|  |  | Registration #: |

| Motor vehicle #2 | Other assets | Other assets |
|---|---|---|
| (Value) $ | (Value) $ | (Value) $ |
| Make and year: |  |  |
| Model: |  |  |
| Registration #: |  |  |

- 3 -

SA-21

6.      *State every person, business, or organization owing you or your spouse money, and the amount owed.*

| Person owing you or your spouse money | Amount owed to you | Amount owed to your spouse |
|---|---|---|
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |
|  | $ | $ |

7.      *State the persons who rely on you or your spouse for support.*

| Name [or, if a minor (i.e., underage), initials only] | Relationship | Age |
|---|---|---|
|  |  |  |
|  |  |  |
|  |  |  |

8.      *Estimate the average monthly expenses of you and your family.  Show separately the amounts paid by your spouse. Adjust any payments that are made weekly, biweekly, quarterly, semiannually, or annually to show the monthly rate.*

|  | **You** | **Your Spouse** |
|---|---|---|
| Rent or home-mortgage payment (including lot rented for mobile home)<br>     Are real estate taxes included? ☐ Yes ☐ No<br>     Is property insurance included? ☐ Yes ☐ No | $ | $ |
| Utilities (electricity, heating fuel, water, sewer, and telephone) | $ | $ |
| Home maintenance (repairs and upkeep) | $ | $ |
| Food | $ | $ |
| Clothing | $ | $ |
| Laundry and dry-cleaning | $ | $ |
| Medical and dental expenses | $ | $ |

- 4 -

SA-22

| | | |
|---|---|---|
| Transportation (not including motor vehicle payments) | $ | $ |
| Recreation, entertainment, newspapers, magazines, etc. | $ | $ |
| Insurance (not deducted from wages or included in mortgage payments) | | |
| Homeowner's or renter's: | $ | $ |
| Life: | $ | $ |
| Health: | $ | $ |
| Motor vehicle: | $ | $ |
| Other: | $ | $ |
| Taxes (not deducted from wages or included in mortgage payments) (specify): | $ | $ |
| Installment payments | | |
| Motor Vehicle: | $ | $ |
| Credit card (name): | $ | $ |
| Department store (name): | $ | $ |
| Other: | $ | $ |
| Alimony, maintenance, and support paid to others | $ | $ |
| Regular expenses for operation of business, profession, or farm (attach detailed statement) | $ | $ |
| Other (specify): | $ | $ |
| **Total monthly expenses:** | $ 0 | $ 0 |

9.  *Do you expect any major changes to your monthly income or expenses or in your assets or liabilities during the next 12 months?*

☐ Yes        ☐ No        If yes, describe on an attached sheet.

10. *Have you spent — or will you be spending —any money for expenses or attorney fees in connection with this lawsuit?* ☐ Yes ☐ No

*If yes, how much?* $ _____

SA-23

11.    *Provide any other information that will help explain why you cannot pay the docket fees for your appeal.*

12.    *Identify the city and state of your legal residence.*

City _____    State _____

Your daytime phone number: _____

Your age: _____    Your years of schooling: _____

Last four digits of your social-security number: _____

- 6 -

SA-24