# 24-1880-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

MURPHY MEDICAL ASSOCIATES, LLC, DIAGNOSTIC AND MEDICAL
SPECIALISTS OF GREENWICH, LLC, STEVEN A.R. MURPHY, M.D.,

*Plaintiffs-Appellants,*

– v. –

1199SEIU NATIONAL BENEFIT FUND,

*Defendant-Appellee,*

1199SEIU UNITED HEALTHCARE WORKERS EAST,

*Defendant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLEE

ELIZABETH CHESLER
*Assistant General Counsel*
1199SEIU BENEFIT AND PENSION FUNDS
General Counsel's Office
498 Seventh Avenue, 10th Floor
New York, New York 10018
(646) 473-6042

*Attorneys for Defendant-Appellee*

CP COUNSEL PRESS    (800) 4-APPEAL • (333320)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................... iii

PRELIMINARY STATEMENT .................................................. 1

COUNTER-STATEMENT OF THE ISSUES ................................ 3

COUNTER-STATEMENT OF THE CASE .................................. 4

    I.     Relevant Facts ............................................................. 4

          A.    The National Benefit Fund ............................. 4

          B.    The Murphy Practice ..................................... 5

          C.    The Murphy Practice's COVID-19 Testing of Fund Members ............................................. 7

    II.    Procedural Background and Decision Below ................. 12

SUMMARY OF ARGUMENT .................................................. 14

ARGUMENT ....................................................................... 15

    I.     The District Court Correctly Dismissed the Amended Complaint For Failure to State a Claim Under ERISA §502(a)(1)(B) ........................................................... 15

          A.    Dismissal is Appropriate When an ERISA Plan Claimant or Assignee Does Not Plausibly Plead Exhaustion of a Plan's Administrative Remedies ................... 16

          B.    The Murphy Practice Does Not Dispute that the Fund's SPDs Require Exhaustion of Administrative Remedies, and It Has Abandoned Any Argument that It Plausibly Plead Actual Exhaustion of Those Remedies .......................... 19

          C.    The Murphy Practice's Amended Complaint Does Not Plausibly Allege Any Factual Bases Excusing its Failure to Exhaust the Fund's Mandatory Administrative Remedies .......................... 22

i

1.    The Murphy Practice Fails to Plausibly Allege that it Attempted to Administratively Appeal the Fund's Adverse Benefit Determinations ........................23

2.    The Murphy Practice Fails to Allege Facts that the Fund's Conduct Excuses its Failure to Exhaust Administrative Remedies .................................27

CONCLUSION ......................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Chambers v. Time Warner, Inc.,*
  282 F.3d 147 (2d Cir. 2002) ................................................................11

*Davenport v. Harry N. Abrams, Inc.,*
  249 F.3d 130 (2d Cir. 2001) ................................................................24

*Diagnostic Affiliates of Ne. Hou, LLC v. United Healthcare Servs., Inc.,*
  No. 2:21-CV-00131, 2022 WL 214101 (S.D. Tex. Jan. 18, 2022),
  *abrogated by Diagnostic Affiliates of Ne. Hou, LLC v. Aetna, Inc.,*
  No. 2:22-CV-00127, 2023 WL 1772197 (S.D. Tex. Feb. 1, 2023)................ 32, 33

*Diamond v. Loc. 807 Lab. Mgmt. Pension Fund,*
  595 F. App'x 22 (2d Cir. 2014) ................................................................17

*Eastman Kodak Co. v. STWB, Inc.,*
  452 F.3d 215 (2d Cir. 2006) ................................................................ 17, 22

*Greifenberger v. Hartford Life Ins. Co.,*
  131 Fed. App'x 756 (2d Cir. 2005)................................................................17

*Heimeshoff v. Hartford Life & Acc. Ins. Co.,*
  571 U.S. 99 (2013)................................................................16

*Kennedy v. Empire Blue Cross & Blue Shield,*
  989 F.2d 588 (2d Cir. 1993) ................................................................ 16, 22

*Kesselman v. The Rawlings Co., LLC,*
  668 F. Supp. 2d 604 (S.D.N.Y. 2009) ................................................................24

*Licorish-Davis v. Mitchell,*
  No. 12-CV-601 ER, 2013 WL 2217491 (S.D.N.Y. May 20, 2013)......................11

*Neurological Surgery, P.C. v. Aetna Health Inc.,*
  511 F. Supp. 3d 267 (E.D.N.Y. January 4, 2021)..................................... 17, 19, 23

*Paese v. Hartford Life & Accident Ins. Co.,*
  449 F.3d 435 (2d Cir. 2006) ................................................................17

*Professional Orthopaedic Associates, PA, et al. v.*
  *1199 National Benefit Fund,*
  16-cv-4838 (KBF), 2016 WL 6900686 (S.D.N.Y. November 22, 2016) ....... 17-18

*Quigley v. Citigroup Supplemental Plan for Shearson Transfers*,
No. 09 CIV. 8944 PGG, 2011 WL 1213218 (S.D.N.Y. Mar. 29, 2011),
*aff'd*, 520 F. App'x 15 (2d Cir. 2013) ...................................................22

*Rajaratnam v. Motley Rice, LLC*,
449 F. Supp. 3d 45 (E.D.N.Y. 2020) .....................................................11

*Rozek v. New York Blood Cntr.*,
925 F. Supp. 2d 315 (E.D.N.Y. 2013) ...................................................19

*Sibley-Schreiber v. Oxford Health Plans (N.Y.), Inc*.
62 F. Supp. 2d 979 (E.D.N.Y. 1999) ................................................ 33, 34

*White v. Univ. of Rochester, Strong Mem'l Hosp*.,
No. 12-CV-6288 CJS, 2012 WL 3598210 (W.D.N.Y. Aug. 20, 2012) ................19

## Statutes & Other Authorities:

Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 *et
seq.* (*"ERISA"*)

29 U.S.C. § 1001 .................................................................... 3, 4, 14

29 U.S.C. § 1132(a); ERISA § 502(a) ........................................................1

29 U.S.C. § 1132(a)(1)(B); ERISA § 502(a)(1)(B) .................................... *passim*

29 C.F.R. § 2560.503-1(c).....................................................................20

29 C.F.R. § 2560-503-1(f)(2)(iii)(B)........................................................29

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"),
Pub. L. 116-127, 134 Stat. 281, § 3202 ...................................................8

CARES Act § 3202(b)(1)..........................................................................8

CARES Act § 3202(b)(2)..........................................................................8

Families First Coronavirus Response Act ("FFCRA"), Pub. L. 116-127,
134 Stat. 178, § 6001 .........................................................................8

Labor Management Relations Act of 1947 § 186(c) ......................................4

Breen, Thomas, *Covid-Test Doc's Woes Mount; UNH Bails*, NEW
HAVEN INDEPENDENT, Nov. 16, 2020........................................................7

iv

CMS, *FAQS About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Implementation Part 43*, June 23, 2020 ...................................................................................8

GREENWICH FREE PRESS, *Greenwich, Darien Residents Say Doctor's Fees Charged to Insurance Companies for Covid Tests Suggest Broken Healthcare System*, November 18, 2020 ........................................... 6-7

*"Profiteer" set up in City Amid Fraud Probe*, NEW HAVEN INDEPENDENT, Jun. 18, 2020 ..............................................................6

Sarah Kliff, *$1,944 for a Coronavirus Test? How Readers Helped Us Spot an Unusual Trend*, NEW YORK TIMES, Nov. 10, 2020 .....................................6

Sarah Kliff, *These Towns Trusted a Doctor to Set Up Covid Testing. Sample Patient Fee; $1,944*, NEW YORK TIMES, Nov. 10, 2020 .....................6

Veronica Del Valle, *Towns and cities cutting ties with medical group*, STAMFORD ADVOCATE, Nov. 14, 2020 ..........................................................7

## PRELIMINARY STATEMENT

Plaintiffs-Appellants Murphy Medical Associates, LLC, Diagnostic and Medical Specialists of Greenwich, LLC, and Steven A.R. Murphy, M.D. ("the Murphy Practice"), a medical provider, sued Defendant-Appellee 1199SEIU National Benefit Fund ("the Fund"), a multiemployer non-profit health plan for healthcare workers, under the Employee Retirement Income Security Act of 1974 ("ERISA") §502(a)(1)(B), 29 U.S.C. §1132(a) to recover ERISA plan benefits on its patients' behalf. Specifically, the Murphy Practice seeks additional reimbursement for COVID-19 testing and related services it provided to the Fund's members. The district court correctly dismissed the Murphy Practice's Amended Complaint with prejudice on the grounds that it failed to plausibly allege that it exhausted the Fund's mandatory appeals process prior to initiating this litigation, nor did it plausibly allege facts that would support being excused from pleading administrative exhaustion.

Plaintiffs seeking an award of ERISA plan benefits must plausibly allege that the plan members, or an authorized representative on the plan members' behalf, first exhausted the ERISA plan's mandatory administrative remedies. Without this requirement, claimants could simply circumvent an ERISA plan's mandatory administrative appeals process, such that there is never a final denial of benefits by the trustees and no administrative record available to the court tasked with reviewing the final determination under an arbitrary and capricious standard of review.

1

Because of the importance of administrative exhaustion prior to judicial review, courts in the Second Circuit have consistently held that claimants must plausibly allege exhaustion of administrative remedies for their legal claims to proceed, and complaints are routinely dismissed at the motion to dismiss stage for a plaintiff's failure to do so. Such is the case here.

Through this action, the Murphy Practice seeks to recover additional reimbursement in connection with medical claims it submitted to the Fund for COVID-19 related testing and services. Many of these claims are for $1500 respiratory panels that test for 21 other pathogens in addition to COVID-19 and are significantly more expensive than standalone COVID-19 testing. While the Fund approved and paid at the appropriate reimbursement rate many of the disputed claims, the Fund – and the other 1199SEIU benefit funds not named as defendants – denied those claims that it was able to identify at the time of processing as being for non-covered services, such as non-diagnostic COVID-19 testing (e.g., employment-related testing) and testing with the multiplex respiratory panels that was not medically necessary. The Murphy Practice never administratively appealed those denials on behalf of its patients through the Fund's delineated process, nor did it make any attempt to do so.

As the district court correctly recognized, the Murphy Practice's Amended Complaint relies exclusively on vague and conclusory allegations, without any

credible supporting factual allegations that the Murphy Practice ever even attempted to exhaust the Fund's mandatory administrative appeals process before initiating this litigation.

The district court correctly found that, even accepting all well-plead allegations as true, the Murphy Practice has not alleged facts sufficient to state a claim under ERISA §502(a)(1)(B) for Plan benefits. This Court should affirm.

## COUNTER-STATEMENT OF THE ISSUES

1. Whether the district court (*Ho, J.*) correctly dismissed with prejudice the Murphy Practice's Amended Complaint for failing to state a claim for benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq*. because the Murphy Practice did not include allegations regarding the manner in which it exhausted the Fund's administrative remedies nor did it plausibly allege the factual bases for a claim that it should be excused from doing so.

## COUNTER-STATEMENT OF THE CASE

### I. Relevant Facts

### A. The National Benefit Fund

The Fund is a multi-employer trust fund established in accordance with Section 186(c) of the Labor Management Relations Act of 1947, as well as an "employee welfare benefit plan" as that term is defined in Employee Retirement Income Security Act of 1974, 29 U.S.C. 1001 *et seq.* ("ERISA").[1]  JA.112 (¶3).  It is also a nonprofit organization administered by a joint Board of Trustees comprised of union and employer appointed trustees.  JA.113 (¶4).

The Fund provides comprehensive medical, prescription, dental, and vision benefits to its members, who are working and retired healthcare industry workers in the 1199SEIU UnitedHealthcare Workers East union ("Union") and their families. JA.112 (¶1).  It provides this coverage in accordance with a written Summary Plan Description that also serves as the Plan ("SPD" or "Plan").  JA.113 (¶5).  The policy

---

[1] The Fund is one of several Taft-Hartley funds that provide healthcare, pension, training and employment, and childcare benefits to the 1199SEIU Union members and their families (collectively, the "1199SEIU Benefit Funds").  JA.112 (¶1).  Only 19 members identified in the Exhibit A to the Amended Complaint were members in the Fund during the relevant dates of service; the remaining 34 members were enrolled in other 1199SEIU benefit funds that provide healthcare benefits to Union members.  JA.114 (¶9).  For purposes of the Fund's motion to dismiss, it did not distinguish between the claims or members in Exhibit A, as the arguments set forth in the motion applied equally to all the disputed claims and demonstrated that leave to further amend should not be granted.

choices of the Fund are set forth in laymen's terms in the SPD, which is distributed to participants upon enrollment in the Fund and which is further publicly available on the Fund's website. *Id.* The SPDs also set forth the process for appealing adverse benefit determinations. JA.113 (¶7); JA.282-285 (2015 SPD); JA.485-489 (2020 SPD); JA.702-707 (2021 SPD).

The Fund expressly requires members to exhaust the Fund's administrative appeals procedure before initiating a lawsuit for benefits under ERISA. *See* JA.485 (2020 SPD)("No lawsuits may be filed until all steps of these procedures have been completed by you or a representative authorized by you, and the benefits requested have been denied in whole or in part"); JA.494 (2020 SPD) ("No legal action may be brought against the Benefit Fund or the Trustees until all remedies under the Fund have been exhausted, including requests for Administrative Reviews or appeals"); JA.499 (2020 SPD) ("A non-participating Provider can only file a lawsuit disputing an Adverse Benefit Determination . . . [a]fter the administrative appeal has been completed …"); *see* JA.282, JA.290, JA.702, JA.711, JA.716 for corresponding provisions in the 2015 and 2021 SPD.

## B.  The Murphy Practice

Plaintiff-Appellant Murphy Medical Associates, LLC and Plaintiff-Appellant Diagnostic and Medical Specialists of Greenwich, LLC are limited liability companies organized under Connecticut law, with principal places of business in

Connecticut.[2] JA.14 (¶¶7-8). Plaintiff-Appellant Steven A.R. Murphy, M.D. is a physician licensed to practice medicine in Connecticut and New York, with a principal place of place in Connecticut. JA.15 (¶9).

Local and national newspapers, including the New York Times, have reported consumers', municipalities', and insurers' concerns with Dr. Murphy and his medical practices' COVID-19- related billing practices, including reporting that patients – even asymptomatic patients – were tested with the multiplex respiratory panel that tests for 21 different pathogens when they thought they were obtaining only coronavirus testing.[3] In addition to suing the Fund for its allegedly improper

---

[2] As the Murphy Practice has alleged that it is an out-of-network provider to whom Fund members have assigned their benefits, the Fund did not dispute its status as an out-of-network provider and assignee at the motion to dismiss stage of the litigation. JA.28 (¶85). However, according to the Fund's records, for the majority of the timeframe covered by the Amended Complaint, the Murphy Practice was participating in the Fund's network through the Fund's contract with Aetna Life Insurance Company, which provides coverage for Fund members through a national network of health care providers and facilities. *See* JA.113 (¶8).

[3] *See, e.g.* Sarah Kliff, *$1,944 for a Coronavirus Test? How Readers Helped Us Spot an Unusual Trend*, NEW YORK TIMES, Nov. 10, 2020, https://www.nytimes.com/2020/11/10/insider/readers-medical-bills-doctor.html; Sarah Kliff, *These Towns Trusted a Doctor to Set Up Covid Testing. Sample Patient Fee; $1,944*, NEW YORK TIMES, Nov. 10, 2020, https://www.nytimes.com/2020/11/10/upshot/covid-testing-doctor-fees.html; *"Profiteer" set up in City Amid Fraud Probe*, NEW HAVEN INDEPENDENT, Jun. 18, 2020, https://www.newhavenindependent.org/article/1_patient_22_covid_tests_46764_billed; GREENWICH FREE PRESS, *Greenwich, Darien Residents Say Doctor's Fees Charged to Insurance Companies for Covid Tests Suggest Broken Healthcare*

denials of claims for COVID-19 testing, the Murphy Practice has sued at least nine other health plans and third-party administrators in connection with their allegedly improper reimbursement of its COVID-19 related services.[4]

### C. The Murphy Practice's COVID-19 Testing of Fund Members

To address the COVID-19 epidemic, Congress passed the Families First Coronavirus Response Act ("FFCRA"), Pub. L. 116-127, 134 Stat. 178 and Coronavirus Aid, Relief, and Economic Security Act (CARES Act), Pub. L. 116-127, which together required group health plans, such as the Fund, to cover FDA-

---

*System*, November 18, 2020, https://greenwichfreepress.com/news/business/greenwich-darien-residents-say-fees-charged-to-insurance-companies-for-covid-tests-suggest-broken-healthcare-system-149576/; Veronica Del Valle, *Towns and cities cutting ties with medical group*, STAMFORD ADVOCATE, Nov. 14, 2020, https://www.stamfordadvocate.com/local/article/Towns-and-cities-cutting-ties-with-medical-group-15727444.php; Breen, Thomas, *Covid-Test Doc's Woes Mount; UNH Bails*, NEW HAVEN INDEPENDENT, Nov. 16, 2020, https://www.newhavenindependent.org/index.php/archives/entry/murphy_update/.
[4] (1) *Murphy Medical Associates, LLC et al. v. Cigna Health and Life insurance Company et al.*, 3:2020-cv-01675 (D.Conn.); (2) *Murphy Medical Associates, LLC et al. v. Molina Healthcare of New York, Inc. et al.*, 3:2021-cv-01137 (D.Conn.); (3) *Murphy Medical Associates, LLC et al. v. Yale University et al.*, 3:2022-cv-00033 (D.Conn.); (4) *Murphy Medical Associates, LLC. et al. v. Emblemhealth, Inc., et al.*, 3:2022-cv-00059 (D.Conn.); (5) *Murphy Medical Associates, LLC et al. v. United Medical Resources, Inc.*, 3:2022-cv00083; (6) *Murphy Medical Associates, LLC v. MagnacareLLC*, 3:2022-cv-00326 (D.Conn.); (7) *Murphy Medical Associates, LLC et al. v. Government Employees Health Association, Inc*, 3:2022-cv-00329 (D.Conn.); (8) *Murphy Medical Associates, LC et al. v. Centene Corp. et al.*, 3:2-22-cv-00504 (D.Conn.); and (9) *Murphy Medical Associates, LLC et al. v. Aetna Health Inc. et al.*, 3:2023-cv-00201 (D.Conn.).

approved diagnostic COVID-19 testing at no cost to plan members, with reimbursement to the provider at either a negotiated rate or the cash price as listed by the provider on a public internet website. FFCRA Section 6001; CARES Act Section 3202.[5] Employment-related and surveillance testing is excluded from this coverage requirement.[6] Based on its understanding of FFCRA/CARES, the Murphy Practice claims it is entitled to reimbursement of its full billed charges for each and every claim submitted to the Fund. JA.37 (¶¶146-149).

The Murphy Practice alleges that from March 2020 through January 2021, it conducted COVID-19 testing and provided related services on Fund members resulting in billed charges of "approximately $633,781.00 for over 490 claims," and for which it was reimbursed approximately $57,628. JA.26 (¶75); JA.41-52 (Ex. A to Amended Complaint). This testing was performed at COVID-19 testing sites that the Murphy Practice set up throughout Connecticut and in select New York locations, as well as through direct arrangements with nursing homes employing Union members for employment-based testing. JA.18 (¶¶29-30), JA.25-26 (¶¶68-70).

---

[5] The CARES Act further requires "each provider of a diagnostic test for COVID-19 [to] make public the cash price for such test on a public internet website of such provider." CARES Act, §3202(b)(1). It imposes a penalty of up to $300 per day the violation is ongoing for non-compliant providers who have not completed a corrective action plan. CARES Act, § 3202(b)(2).

[6] *See, e.g.* CMS, *FAQS About Families First Coronavirus Response Act and Coronavirus Aid, Relief, and Economic Security Implementation Part 43*, June 23, 2020, https://www.cms.gov/files/document/FFCRA-Part-43-FAQs.pdf, Q5.

The vast majority of this testing (by the Fund's count from Exhibit A to the Amended Complaint, approximately 75% of the COVID-19 testing) was performed through a BioFire Film Array Panel that tested for 21 other respiratory pathogens in addition to COVID-19. JA.20-21 (¶¶41-43), JA.41-52. The Murphy Practice does not allege that a price for this test, or for any of its COVID-19 testing, was ever publicly posted, but its Exhibit A listing the medical claims that are the subject of this litigation reflects that the charge to the Fund was $1,500 per BioFire test, consistent with the Fund's records. Exhibit A lists a total of 496 claims and it reflects that approximately 172 of those claims were covered and paid and approximately 324 were denied. It further reflects that the Murphy Practice repeatedly tested the same individuals.[7] The 1199SEIU Benefit Funds, which maintain an Appeals Department that logs all appeals handled by the 1199SEIU Benefit Funds, had no record of any appeals on file for the claims listed on Exhibit A to the Amended Complaint. JA.114 (¶12).

In its Amended Complaint, the Murphy Practice alleges that "starting in or about February 2021," through staff, it "reached out regularly to the Fund requesting

---

[7] For example, Exhibit A to the Amended Complaint (JA.41-52) reflects:
• Patient No. 33682 was tested 16 times between June 3, 2020 and Sept. 14, 2020;
• Patient No. 33704 was tested 18 times between May 29, 2020 and Sept. 14, 2020;
• Patient No. 41945 was tested 16 times between May 29, 2020 and Sept, 14. 2020; and
• Patient No. 33751 was tested 19 times between May 21, 2020 and Sept.15, 2020.

further explanation of the Fund's determination after receiving these [Explanation of Payments], and the process for resolving the parties' dispute." JA.33 (¶112). In response, the Fund allegedly "requested documentation for its never-ending review of the claims." JA.33 (¶113), JA.85-87. The Murphy Practice alleges that it "provided documentation of the claims, going so far as to create detailed patient spreadsheets generated to facilitate the Fund's review." JA.33 (¶114). It alleges that in or about early September 2021, after receiving no response from the Fund, it "again, corresponded regularly with the Fund requesting an explanation for the Fund's failure to reimburse the claims submitted," and the Fund did not "communicate that there was an additional appeal or some alternative administrative process that the Murphy Practice was required to follow to properly adjudicate these claims." JA.33 (¶¶115-116).

The Murphy Practice also attaches to its Amended Complaint a list of members' names, which it describes as "a true and accurate copy of the Fund's request for medical records for every single member of the Fund's health plans that submitted to the Murphy Practice for testing" in support of its allegations as to its supposed administrative appeals. JA.33 (¶¶ 112-113), JA.85-87. The Fund's records reflect that this document is one of several attachments to a February 16, 2021 email to the Murphy Practice from a Senior Investigator in the Fund's Fraud and Abuse

Department.  JA.99 ¶3, JA.101-11.[8]  This email exchange reflects that, in fact, the

Fund's Fraud and Abuse Department reached out to the Murphy Practice on February

12, 2021 asking for confirmation that the Fund had identified the appropriate email

address to direct an encrypted request for medical records, and the Murphy Practice

confirmed the accuracy of the email address on February 15, 2021.  The next day,

the Fraud and Abuse Senior Investigator sent three documents via email to the

Murphy Practice: (a) a record certification form, (b) a letter on Fund letterhead from

the Assistant Director of the Fraud and Abuse Department explaining that the Fund

is conducting a "post-payment review of certain claims submissions and payment

history" and is requesting medical records in connection with that review, and (c)

"Sample Murphy Medical.pdf" containing the names, member ID numbers, and

---

[8] The Court may properly consider these documents at the motion to dismiss stage. The Murphy Practice submitted a portion of this communication as an exhibit to its Amended Complaint, and thus the communication between the parties, of which that exhibit is a part, is incorporated by reference into the Amended Complaint.  Further, the Murphy Practice's reliance on this specific document, only a narrow portion of which was attached to its Amended Complaint, is expressly relied upon as evidencing its supposed exhaustion of administrative remedies and/or the futility thereof, and it is thus "integral" to the Amended Complaint and, accordingly, may be considered at this stage.  *See, e.g., Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152 (2d Cir. 2002); *see also Rajaratnam v. Motley Rice, LLC*, 449 F. Supp. 3d 45, 63 (E.D.N.Y. 2020) ("Where the complaint cites or quotes from excerpts of a document, the court may consider other parts of the same document submitted by the parties on a motion to dismiss"); *Licorish-Davis v. Mitchell*, No. 12-CV-601 ER, 2013 WL 2217491, at n. 4 (S.D.N.Y. May 20, 2013) ("As a portion of the document was included as an exhibit to the Complaint, the Court may consider the complete copy of the [document] that is attached as an exhibit to Defendants' 'papers.'").

dates of birth for the members for whom Fraud and Abuse Department sought medical records. It is the "Sample Murphy Medical.pdf" attachment (JA.110-111) that the Murphy Practice attaches as Exhibit D to its Amended Complaint (JA.86-87).

## II.   <u>Procedural Background and Decision Below</u>

The Murphy Practice filed its Complaint against the Fund on January 13, 2022, asserting eight different causes of action to compel the additional payment sought, including asserting causes of action directly under FFCRA/CARES. The Fund moved to dismiss each of the causes of action, and the district court dismissed each of the claims with prejudice, except for the Murphy Practice's claim for Plan benefits under ERISA § 502(a)(1)(B), which was dismissed without prejudice on the grounds that the Murphy Practice had not sufficiently alleged exhaustion of the Plan's mandatory administrative remedies. JA.1-12. The Murphy Practice never appealed the district court's order dismissing the seven claims with prejudice.

In granting the Murphy Practice leave to amend its claim for benefits under ERISA § 502(a)(1)(B), the district court expressly instructed the Murphy Practice to remedy its pleading failure in any Amended Complaint, stating: "Any Amended Complaint must include allegations regarding the manner in which Murphy Medical has exhausted its administrative remedies or the factual bases for a claim that it should be excused from doing so." JA.9. On May 15, 2023, the Murphy Practice

filed its Amended Complaint asserting a sole cause of action under "ERISA." JA.13-40. The Fund moved to dismiss the Amended Complaint on the grounds that the Murphy Practice still failed to plausibly allege facts reflecting actual exhaustion of administrative remedies or the futility of doing so. JA.98. The district court agreed, dismissing the Murphy Practice's Amended Complaint with prejudice. JA.747-760.

First, the district court found that the Murphy Practice did not allege facts reflecting that it administratively appealed the Fund's denials, as required by the Fund's SPD. The district court found that "[n]owhere in the Amended Complaint do Plaintiffs purport to have taken" either: (a) the initial step of requesting an administrative review or (b) an appeal to the Fund's trustees if that initial review was unsuccessful. JA.753. The district court further noted that the Murphy Practice's opposition brief did not dispute the Fund's argument that it failed to take any step in the Fund's delineated appeals process and concluded that "[i]n doing so, Plaintiffs concede that they did not exhaust administrative remedies prior to filing suit." JA.753.

Second, the district court found that the Murphy Practice did not make the legally-required "clear and positive showing" that pursuing the Fund's administrative appeals process would be futile in order to excuse its failure to exhaust administrative remedies. JA.754-757. The district court addressed each of the Murphy Practice's arguments that it should be excused from the exhaustion

13

requirement and found that each lacked credible supporting factual allegations. Based on this assessment, the district court held: "Far from making a 'clear and positive showing,' Plaintiffs rely on conclusory statements to attempt to demonstrate that it would have been futile to exhaust administrative remedies. Even on a motion to dismiss, this cannot suffice." JA.755.

## SUMMARY OF ARGUMENT

The district court correctly dismissed with prejudice the Murphy Practice's Amended Complaint for failing to allege facts sufficient to state a claim for benefits pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et. seq.*

I. The district court correctly concluded that a cause of action to recover plan benefits under ERISA §502(a)(1)(B) should be dismissed when a claimant or assignee fails to provide credible factual allegations that an ERISA plan's mandatory administrative remedies were exhausted before initiating litigation or that such exhaustion should be excused.

II. The district court correctly concluded that the Murphy Practice did not include credible factual allegations sufficient to plausibly plead that the Fund's mandatory administrative remedies were exhausted, and that the Murphy Practice ultimately abandoned any such argument of actual exhaustion.

14

III.    The district court correctly concluded that the Murphy Practice did not include credible factual allegations sufficient to plausibly plead that it should be excused from exhausting the Fund's mandatory administrative remedies prior to initiating a lawsuit for benefits under ERISA §502(a)(1)(B).

The district court correctly dismissed the Murphy Practice's Amended Complaint with prejudice and its decision should be affirmed.

## ARGUMENT

### I.    The District Court Correctly Dismissed the Amended Complaint For Failure to State a Claim Under ERISA §502(a)(1)(B)

Despite the district court granting the Murphy Practice an opportunity to cure its first deficient pleading of its claim for benefits under ERISA, and providing specific guidance as to how it could be cured, the Murphy Practice's Amended Complaint still fails to state a claim for Plan benefits under ERISA §502(a)(1)(B) because it is entirely devoid of plausible allegations "regarding the manner in which Murphy Medical has exhausted its administrative remedies or the factual bases for a claim that it should be excused from doing so." JA.9. Its Amended Complaint fails to allege any facts from which a court could infer that the Murphy Practice actually exhausted the Fund's mandatory administrative appeals process on behalf of its patients for *any* of the disputed claims or that such administrative exhaustion should be excused. This pleading failure justifies dismissal at the motion to dismiss stage.

### A. Dismissal is Appropriate When an ERISA Plan Claimant or Assignee Does Not Plausibly Plead Exhaustion of a Plan's Administrative Remedies

The Murphy Practice seeks to recover ERISA plan benefits in its capacity as its patients' assignee through a single claim under ERISA §502(a)(1)(B). In order to state a claim for benefits under ERISA §502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), a plaintiff must include, *inter alia*, plausible factual allegations that the Plan's mandatory administrative remedies were exhausted prior to initiating the litigation. As the Supreme Court has recognized, "[a] participant's cause of action under ERISA accordingly does not accrue until the plan issues a final denial." *Heimeshoff v. Hartford Life & Acc. Ins. Co.*, 571 U.S. 99, 105 (2013).

This exhaustion requirement serves several important purposes, as the district court noted in its decision, stating: "the administrative exhaustion 'requirement was intended to help reduce the number of frivolous lawsuits under ERISA; to promote the consistent treatment of claims for benefits; to provide a nonadversarial method of claims settlement; and to minimize the costs of claims settlement for all concerned.'" JA.752, quoting *Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993). The district court further observed that because of these important purposes, federal courts, including the Second Circuit "have recognized a firmly established federal policy favoring exhaustion of administrative

16

remedies in ERISA cases." JA.752, citing *Paese v. Hartford Life & Accident Ins. Co.*, 449 F.3d 435, 443 (2d Cir. 2006).

Indeed, under the consistent and unambiguous case law in the Second Circuit, when a claimant, or assignee, has failed to exhaust a plan's mandatory appeals process prior to initiating litigation, the complaint must be dismissed. *See, e.g., Diamond v. Loc. 807 Lab. Mgmt. Pension Fund*, 595 F. App'x 22, 25 (2d Cir. 2014) (affirming district court's ruling granting defendant's motion to dismiss a claim for benefits under ERISA, stating: "Because [Plaintiff] was seeking only to receive benefits under the Plan that he contends were withheld in violation of the terms of the Plan, he was required to exhaust his administrative remedies. Because he failed to do so, his claim was properly dismissed"); *Greifenberger v. Hartford Life Ins. Co.*, 131 Fed. App'x 756, 759 (2d Cir. 2005)(affirming district court's ruling granting dismissal of an ERISA § 502(a)(1)(B) claim for failure to exhaust administrative remedies); *Eastman Kodak Co. v. STWB, Inc.*, 452 F.3d 215, 219 (2d Cir. 2006) ("ERISA requires ... that plan participants avail themselves of [claims] procedures before turning to litigation")(internal citations omitted); *Neurological Surgery, P.C. v. Aetna Health Inc.*, 511 F. Supp. 3d 267, 293 (E.D.N.Y. January 4, 2021) ("The failure to exhaust administrative remedies before filing an action in federal court requires ERISA cause of action to be dismissed"); *Professional Orthopaedic*

*Associates, PA, et al. v. 1199 National Benefit Fund*, 16-cv-4838 (KBF), 2016 WL 6900686 * 5 (S.D.N.Y. November 22, 2016).

Accordingly, the district court correctly ruled that the Murphy Practice's failure to plausibly plead facts reflecting that it exhausted the Fund's administrative remedies is a basis for a dismissal. In so ruling, the district court expressly rejected the Murphy Practice's argument that its failure to plausibly allege exhaustion of administrative remedies cannot serve as the basis for dismissal because it is an affirmative defense and not part of a *prima facie* claim for benefits. Consistent with the case law cited above, the district court observed that "[w]hile the failure to exhaust administrative remedies is an affirmative defense . . . courts have nevertheless dismissed claims where plaintiffs fail to plead, or plead only in conclusory fashion, that they have exhausted their administrative remedies." JA.752.

In this appeal, the Murphy Practice does not attempt to argue that the district court misapprehended or misapplied the relevant case law on exhaustion of administrative remedies in dismissing its Amended Complaint. Instead, it argues vaguely that it should not have to plead exhaustion for its claim to proceed, without contending with the weight of the case law holding otherwise. Appellants' Brief ("Br.") 19. The few cases it cites do not support its proposition.

18

For example, while the Murphy Practice relies on *Rozek v. New York Blood Cntr.*, the question before the court in that case was whether the defendants could raise the plaintiff's failure to exhaust administrative remedies for the first time on summary judgment, despite not having ever asserted it as an affirmative defense. 925 F. Supp. 2d 315 (E.D.N.Y. 2013). Indeed, a district court in Eastern District of New York explicitly clarified that *Rozek* is not relevant with respect to a motion to dismiss based on failure to exhaust administrative remedies, stating: "On the exhaustion issue, *Rozek*'s quote merely affirms the ordinary requirement that defendants, not plaintiffs, plead affirmative defenses." *Neurological Surgery, P.C. v. Aetna Health Inc.,* 511 F. Supp. 3d 267, 296 (E.D.N.Y. 2021). Similarly, in *White v. Univ. of Rochester, Strong Mem'l Hosp.*, the court's discussion of exhaustion was *dicta*, as the complaint that the defendant sought to dismiss "does not purport to assert a claim under Section 502(a)(1)(B)." No. 12-CV-6288 CJS, 2012 WL 3598210, at *3 (W.D.N.Y. Aug. 20, 2012).

**B. The Murphy Practice Does Not Dispute that the Fund's SPDs Require Exhaustion of Administrative Remedies, and It Has Abandoned Any Argument that It Plausibly Plead Actual Exhaustion of Those Remedies.**

The Fund's SPDs in effect during the relevant time period expressly require exhaustion of its mandatory claims procedure (also known as "appeals procedures," "administrative remedies," or "internal review procedures") before initiating a

lawsuit for benefits. *See also* 29 C.F.R. § 2560.503-1(c). The 2020 SPD clearly states:

> **NOTE:** All claims by you, your spouse, your children or your beneficiaries against the Benefit Fund are subject to the Claims and Appeal Procedure. No lawsuits may be filed until all steps of these procedures have been completed by you or a representative authorized by you, and the benefits requested have been denied in whole or in part.
>
> JA.485 (2020 SPD); JA.702 (2021 SPD)(same); JA.282 (2015 SPD)(similar).

The SPDs continue to set forth the procedures for pursing an administrative appeal.

Additionally, the Explanation of Benefits ("EOBs") sent to members in connection with their claims expressly states:

> Under your Fund's Appeals Procedures (Section VII.B of your SPD), you have a right to appeal this determination by writing to the following address: 1199SEIU Benefit Funds, PO Box 646, New York, NY 10108-0646. This appeal must be requested in writing within 180 days of receipt of your notice. Be sure to include any information to support your appeal.
>
> JA.114 (¶10).

The Murphy Practice does not dispute that the Fund requires exhaustion of administrative remedies, yet the 1199SEIU Benefit Funds have no record of administrative appeals for any of the claims at issue in this Amended Complaint. JA.114 (¶12). In its Amended Complaint, the Murphy Practice relies exclusively on

conclusory[9] – and contradictory[10] – allegations as to actual exhaustion of administrative remedies.

Indeed, the Murphy Practice, in apparent recognition of the weakness of its allegations, failed to respond to any of the Fund's arguments in its motion to dismiss the Amended Complaint that the Murphy Practice did not plausibly plead actual exhaustion, leading the district court to hold that in failing to respond, "Plaintiffs concede that they did not exhaust administrative remedies prior to filing suit." JA.753. And in its opening brief in this appeal, the Murphy Practice neither disputes this characterization nor makes any effort to argue that it plausibly alleged actual exhaustion of the Fund's administrative remedies.

---

[9] For example, the Murphy Practice asserts, without any credible supporting factual allegations, that it has "appealed every claim which the Fund has either denied or partially reimbursed" (JA.33 (¶117), JA.35 (¶126)), and elsewhere alleges that it "has appealed every claim submitted to the Fund, which were summarily denied" JA.14 (¶5). The Murphy Practice also alleges that the Fund "advised to the Murphy Practice that it has exhausted all appeal rights," but it does not allege who at the Funds so advised, with respect to which claims, or the context in which this statement was allegedly made. JA.14 (¶5). Notably, the Funds' SPDs expressly provide that because "telephone conversations and other oral statements can easily be misunderstood, they cannot be relied upon if they are in conflict with what is stated in this SPD." JA.533 (2021 SPD); JA.320 (2020 SPD) JA.119 (2015 SPD).

[10] The Murphy Practice somehow alleges that it "has exhausted available administrative remedies" *or* that such exhaustion would be futile *and* alternatively, that the Fund's (unsubstantiated) disregard for ERISA's procedures excuses its failure to exhaust. JA.39 (¶158).

### C. The Murphy Practice's Amended Complaint Does Not Plausibly Allege Any Factual Bases Excusing its Failure to Exhaust the Fund's Mandatory Administrative Remedies.

Having abandoned any argument that it actually exhausted the Fund's administrative remedies, the Murphy Practice relies exclusively on a narrow exception permitted under Second Circuit jurisprudence where a claimant's failure to exhaust a plan's mandatory administrative remedies may be excused in limited circumstances where a plaintiff plausibly alleges that attempts to exhaust such remedies would be futile. *See Kennedy v. Empire Blue Cross & Blue Shield*, 989 F.2d 588, 594 (2d Cir. 1993) ("Where claimants make a clear and positive showing that pursuing available administrative remedies would be futile, the purposes behind the requirement of exhaustion are no longer served, and thus a court will release the claimant from the requirement.") (internal quotation marks omitted).

However, "[t]he standard for demonstrating futility is 'very high,'" and plaintiffs cannot rely on bare allegations that exhaustion would be futile without supporting factual allegations. *Quigley v. Citigroup Supplemental Plan for Shearson Transfers*, No. 09 CIV. 8944 PGG, 2011 WL 1213218, at *6 (S.D.N.Y. Mar. 29, 2011), *aff'd*, 520 F. App'x 15 (2d Cir. 2013) (granting motion to dismiss for failure to exhaust administrative remedies because plaintiffs did not make a "clear and positive" showing of futility); *see also Eastman Kodak Co. v. STWB, Inc*., 452 F.3d 215, 219 (2d Cir. 2006) ("Unless a 'clear and positive showing' is made that it would

be futile for the claimant to pursue her claim through the internal claims process, that remedy must be exhausted prior to the institution of litigation") (internal quotation marks omitted); *Neurological Surgery, P.C. v Aetna Health Inc.* 511 F. Supp. 3d 267, 296 (E.D.N.Y. January 4, 2021).

As set forth below, the district court correctly determined that the Murphy Practice's Amended Complaint fails to allege any credible, non-conclusory facts, much less make a "clear and positive showing," that pursuing exhaustion of the Fund's mandatory administrative remedies would be futile. Rather than a short and concise recitation of credible facts reflecting the Murphy Practice's efforts to administratively appeal and how those efforts were rendered futile by the Fund's conduct, the Murphy Practice instead relies on a smattering of conclusory and/or irrelevant allegations that attempt to distract from its fundamental inability to plead relevant facts as to why it should be excused from administrative exhaustion.

### 1. The Murphy Practice Fails to Plausibly Allege that it Attempted to Administratively Appeal the Fund's Adverse Benefit Determinations.

As a threshold matter, the Murphy Practice's attempts to evade the exhaustion requirement fall short because it does not allege any credible, non-conclusory facts reflecting that it made any attempt whatsoever to appeal "as that term is used in ERISA precedent – i.e., pursuant to the ERISA plan provisions." *Neurological Surgery, P.C.,* 511 F. Supp. 3d at 297. For the Murphy Practice to be excused from

the Fund's administrative appeals process, it must include credible factual allegations that it attempted to appeal *pursuant to the Fund's delineated procedures*. "Under Second Circuit case law, courts look to whether plaintiffs have utilized and exhausted administrative remedies *under the plan* at issue, rather than pursuant to plaintiff's understanding of what may constitute the best method of addressing her claims." *Kesselman v. The Rawlings Co., LLC*, 668 F. Supp. 2d 604, 609 (S.D.N.Y. 2009) (emphasis in original)(rejecting the plaintiff's arguments that her attorney's letters disputing the claims should be sufficient to establish exhaustion because was never advised of her rights to appeal under the plan)(providing string citation in support); *see also Davenport v. Harry N. Abrams, Inc.*, 249 F.3d 130, 133 (2d Cir. 2001) (holding informal correspondence "did not render futile further pursuit of her claims *through the proper channels*" (emphasis added)).

Here, the Murphy Practice has not even alleged that it obtained the necessary member authorization required for a provider to administratively appeal adverse benefit determinations on its patients' behalf, even though the Fund's SPD explicitly requires such an authorization. The SPD specifically states that non-participating providers do not have independent appeal rights, but members may assign their rights to payment and authorize a provider to appeal on their behalf. JA.284 (2015 SPD); JA.489 (2020 SPD); JA.706 (2021 SPD). The Fund has its own Appeal

Representation Authorization Form[11] that must be completed before a provider may pursue an administrative appeal on behalf of an assignee, and the Murphy Practice does not allege that it ever submitted this form to the Fund on behalf of any of the members whose claims serve as the basis for this litigation.

Indeed, *none* of the Murphy Practice's allegations reflect that its communications with the Fund were part of an effort to administratively appeal the denied claims on the members' behalf using the Fund's delineated appeals processes. Instead, it relies exclusively on allegations that are entirely devoid of necessary context or relevant details. For example, the Amended Complaint vaguely alleges: "Accordingly, starting in or about February 2021, the Murphy Practice, through its staff, reached out regularly to the Fund requesting further explanation for the Fund's determination after receiving these [Explanation of Payments], and the process for resolving the parties' dispute." JA.33 (¶112). It then alleges that the Fund requested certain medical documentation, which the Murphy Practice allegedly provided. JA.33 (¶¶ 113-115).

Among myriad other pleading failures, these allegations do not reflect: (a) to which of the Fund's many departments the Murphy Practice "reached out" to and to whom it spoke; (b) whether this outreach was an attempt to administratively appeal

---

[11] The Fund's authorization form may be found online at https://www.1199seiubenefits.org/wp-content/uploads/2019/03/Benefit-Appeal-Representation-Authorization-Form.pdf.

each of the disputed claims in its Exhibit A on behalf of its patients or some other type of outreach; (c) whether the medical documentation was requested and provided in the context of an administrative appeal for each disputed claim; or (d) if so, whether was submitted within the SPD's required timeframe for appealing an adverse benefit determination. Its allegations amount to nothing more than at some point in the month of February 2021, it reached out to some unspecified individual or department at the Fund about some unspecified set of claims that may or may not include all of the disputed claim in its Exhibit A, and then it submitted unspecified documentation for this unspecified set of claims to an unspecified individual or department at the Fund and the submissions for those unspecified claims may or may not have been within the SPD's timeframe for administratively appealing. This failure to allege essential relevant facts is fatal to its claim – as set forth in the case law cited above, the Murphy Practice cannot simply rely on vague references to communications between the parties if it seeks to be excused from administrative exhaustion requirements. *See supra* pp. 22-24.

Incredibly, the Murphy Practice's sole effort to document its efforts to administratively appeal is undermined by the very exhibit on which it relies – its Exhibit D. JA.85-87. The Murphy Practice alleges that in response to its February 2021 outreach, the Fund "requested documentation for its never-ending review of the claims," as reflected in Exhibit D to the Amended Complaint, which is a list of

member names.  JA.33 (¶¶113; 112-117).  Not only does the Murphy Practice not allege any facts setting forth the Fund's purported "never-ending review" of the claims, the entirety of the correspondence in connection with Exhibit D reflects that this document was sent by the Fund's Fraud and Abuse Department – *not* its Appeals Department – to the Murphy Practice because the Fund's Fraud and Abuse Department was conducting a retrospective investigation of the Murphy Practice's paid claims submitted for the identified members.  JA.99-111.  The full correspondence reflects that the Fund requested these medical records in connection with the Fund's fraud and abuse investigation into the Murphy Practice and *not* in connection with any affirmative effort by the Murphy Practice to administratively appeal the Fund's adverse benefit determinations on its patients' behalf.

### 2. The Murphy Practice Fails to Allege Facts that the Fund's Conduct Excuses its Failure to Exhaust Administrative Remedies.

Even if the Court was still willing to consider the possibility that the Murphy Practice's failure to exhaust administrative remedies could be excused — notwithstanding that it made absolutely no effort to initiate any administrative appeals of the denied claims — the Murphy Practice fails to include factual allegations as to the Fund's handling of the claims that would support such an exception.  Again, rather than assert straightforward factual allegations concerning the Fund's handling of the disputed claims, the Murphy Practice relies on a potpourri

of conclusory, and largely irrelevant, allegations in an unavailing effort to create a general impression of wrongdoing by the Fund.

For example, the Murphy Practice alleges that the Fund's Explanation of Payments ("EOPs") "did not provide any detailed instruction regarding an administrative appeal process." JA.33 (¶111). However, the right to administratively appeal belongs exclusively to *participants and beneficiaries* under ERISA (*not* their providers),[12] and accordingly the Explanation of Benefits that the Fund sent to members in connection with their claims expressly advise of the right to appeal an adverse benefit determination and points members to the exact section of the SPD that sets forth the appeals procedurals. JA.114 (¶10). Similarly, while the Murphy Practice attempts to raise a question as to the sufficiency of the Fund's provider-facing EOPs (Br. 21), which it fails to distinguish from the EOBs that members receive, the sufficiency of these documents is evident on their face, as they clearly state a denial basis and provide an SPD reference. The Fund's EOPs and

---

[12] While the Murphy Practice argues on appeal that FFCRA/CARES Act reimbursement "mandate" transforms the Murphy Practice into a claimant (by which, it presumably means "Participant") under ERISA thus entitling it to all of an ERISA plan participant's procedural rights under ERISA (Br. 22), it provides no legal support or analysis for this novel proposition, which not only ignores the text of the statute itself, but is also contrary to the very purpose of ERISA §502(a)(1)(B), which is to provide *health plan participants* with an avenue to obtain the *benefits owed to them under their ERISA plan*. The Murphy Practice has sued as the members' assignee, and it manifestly has no independent, direct rights against the Fund under ERISA as a "claimant."

EOBs are readily distinguishable from situations where courts have found plans non-compliant with ERISA claims procedures.

Further, while the Murphy Practice generally alleges that the Fund "rarely, if ever" complied with ERISA's timeframes for processing its claims, its fails to support this conclusory accusation with any relevant, credible factual allegations. JA.31 (¶100; ¶¶99-102). Instead, the Murphy Practice claims that timeliness is evident from the face of the EOPs (JA.31(¶103)); it is not, because EOPs do not show the date the claims were received, which is when the "clock starts" on ERISA's claim processing timeframes. *See* 29 C.F.R. § 2560-503-1(f)(2)(iii)(B)("In the case of a post-service claim, the plan administrator shall notify the claimant, in accordance with paragraph (g) of this section, of the plan's adverse benefit determination within a reasonable period of time, *but not later than 30 days after receipt of the claim*")(emphasis added). Moreover, EOPs are provider documents, issued only to providers. The Murphy Practice's allegations ignore that ERISA creates member-facing obligations with respect to claims processing, and it does not create any substantive rights for providers; thus, the Murphy Practice's exclusive reliance on when the Fund issued its payment to the Murphy Practice is entirely misplaced. Notably, it does not allege (even in a conclusory manner) that the Fund failed to provide the members with timely adverse benefit determinations (i.e., Explanations of Benefits).

And while its Exhibit C (JA.60-84) is intended to support its allegations as to the Fund's purported failures, this EOP is immaterial for several reasons: First, it is plainly an EOP from the 1199SEIU Greater New York Benefit Fund, a legally distinct fund that the Murphy Practice did not name as a defendant in this action.[13] Second, while the EOP does not show the date the claim was received by that fund, its records reflect that the claims in Exhibit C were processed promptly after receipt and paid well within thirty days of the receipt. JA.114 (¶13). Third, as stated above, the claims regulation deadline is not applicable to provider reimbursement, particularly when, as reflected in its Exhibit C, payment was issued to a provider participating through their agreement with Aetna (the member has no payment responsibility and is held harmless).

In short, the Murphy Practice utterly fails to include critical factual allegations needed support its legal conclusion that the Fund's processing of any of the disputed claims was untimely, such as identifying which of the disputed claims were allegedly untimely processed and any relevant facts thereto.

The Murphy Practice also attempts to portray administrative appeals as futile by claiming the Fund only reimbursed it 10% of its billed charges and "reflexively

---

[13] Exhibit C to the Amended Complaint (JA.60-84) identifies itself as an EOP from the 1199SEIU Greater New York Benefit Fund on the very first page. Notably, the Murphy Practice describes this document as a "true and accurate copy" of the Fund's EOPs, notwithstanding that it is not from the Fund and the document has markings on it that clearly would not have been in the original EOPs issued.

denied thousands of claims for the exact same clearly reimbursable services, without providing any legitimate justification." JA.35 (¶129). Once again, these allegations are unavailing, as the Murphy Practice does not include any factual allegations in support of its characterization that the Fund "reflexively denied" any of these claims. Indeed, its own Amended Complaint (JA.35, ¶128)[14] and Exhibit A (JA.41-52) reflect that there is a total of only 496 disputed claims, so it is impossible for the Fund to have reflexively denied "thousands."

Further, Exhibit A reflects that of the approximately 496 claims in dispute, approximately 172 claims were covered and paid and approximately 324 were denied, meaning that far from "reflexively denying" its claims (whatever that means), approximately 35% of the claims were approved and reimbursed by the member's 1199SEIU benefit fund. That the remaining claims were denied does not demonstrate the futility of the appeals process, but rather demonstrates nothing more nor less than the fund's determination that particular services were not covered under the terms of the Plan for the reasons indicated on the Explanation of Payment that goes to the provider and Explanation of Benefit that goes to the member. To the extent the Murphy Practice believes any of the claims were improperly denied, the next step is to administratively appeal as an authorized representative – not to ignore

---

[14] While the Amended Complaint refers to 497 COVID-19 tests and services administered (JA.35 (¶128)), the Fund's analysis of Exhibit A reflects 496 claims.

this mandatory process, miss the Fund's appeal deadline, initiate litigation, and then try to creatively plead its way out its failure to satisfy this threshold requirement in order to advance a specious complaint unburdened by an administrative appeal record or judicial deference to the Fund.

The Murphy Practice cannot just invoke its own characterization of the Fund's denials as "reflexive" to survive a motion to dismiss – it must include credible *factual* allegations that make a clear and positive showing supporting this subjective characterization. Here, its utter failure to include such allegations is underscored by the Amended Complaint's sharp contrast to the two cases on which the Murphy Practice relies to support its futility argument. Br. 22-23.

First, in *Diagnostic Affiliates*, which also involved a provider's claims seeking further reimbursement for COVID-19 testing, the court found that the complaint sufficiently alleged the futility of pursuing administrative exhaustion because it was "replete with detailed factual allegations—including documentary evidence— describing the claim processing and review procedures that they have invoked with Defendants and the allegedly improper, inconsistent, insufficient, and overwhelmingly negative results they have obtained, even where all procedures are exhausted." *Diagnostic Affiliates of Ne. Hou, LLC v. United Healthcare Servs., Inc*., No. 2:21-CV-00131, 2022 WL 214101, *10 (S.D. Tex. Jan. 18, 2022), *abrogated by Diagnostic Affiliates of Ne. Hou, LLC v. Aetna, Inc.,* No. 2:22-CV-00127, 2023 WL

1772197 (S.D. Tex. Feb. 1, 2023). Here, despite a second bite at the apple, the Murphy Practice still fails to make any such "detailed factual allegations" in its Amended Complaint, and there is certainly no supporting documentary evidence. Further in *Diagnostic Affiliates*, the court found that the plaintiff's allegations "reflect[ed] actual results from actual submissions at the final level, not just prognostications from preliminary results." *Diagnostic Affiliates* at 10. Here, the Murphy Practice cannot even allege that it exhausted the Fund's administrative appeals process, or even attempted to pursue an appeal through its delineated process, for just a *single one* of the disputed claims.

Similarly, the Murphy Practice relies on *Sibley-Schreiber v. Oxford Health Plans (N.Y.), Inc*. in support of its futility argument, even though the allegations in its Amended Complaint remain in stark contrast to those in *Sibley-Schreiber*. 62 F. Supp. 2d 979 (E.D.N.Y. 1999). In *Sibley-Schreiber*, the court found that insureds sufficiently alleged futility, in part because each plaintiff "communicated with defendants on numerous occasions in an effort to get an exception from defendants' publically [*sic*] announced policies," regarding coverage of certain prescription drugs, and each "submitted affidavits detailing their efforts at securing coverage for the prescribed medication." *Id.* at 982. There are no such allegations in the Amended Complaint. Not only is *Sibley-Schreiber* factually distinct, but that court further observed that "[c]ourts have been unwilling to conclude that pursuit of the

administrative process is futile absent evidence that a plaintiff sincerely attempted to resolve its dispute extrajudicially. Certainly, an allegation of futility is not satisfied by the mere showing that a claim was denied when initially presented to the insurance company." *Id.* (quotation omitted). The Murphy Practice has done precisely what the court in *Sibley-Schreiber* admonished: it has asserted futility without alleging credible facts that reflect any sincere efforts to resolve the dispute extrajudicially.

Finally, the Murphy Practice alleges that the Fund purportedly directed its members "to conceal the Fund's health plan information from the Murphy Practice when presenting for COVID-19 testing or related services," further claiming that due to this lack of information, "those claims had to be submitted to HRSA's COVID-19 Uninsured Program for reimbursement." JA.36 (¶¶135-136.) It is unclear what purpose these allegations are intended to serve. Even assuming these allegations were credible, they are completely irrelevant with respect to the claims in its Exhibit A – i.e., the claims that serve as the basis for its lawsuit – as that chart reflects claims that *were* submitted to the benefit funds and fully processed. More broadly, the allegations are legally irrelevant with respect to *any* claim for Plan benefits under ERISA §502(a)(1)(B) because this cause of action is available to *Plan members* to recover benefits owed to them under the Plan. There is no cause of action under ERISA for claims that were never submitted to the Plan and were otherwise

reimbursed by another entity. Further, a member (and thus an assignee on its behalf) cannot argue that the Fund prevented the submission of claims to the Fund because if a member believed a COVID-19 related service should have been covered by the Fund, that member has all of the necessary information to submit a claim for reimbursement.

To the extent the Murphy Practice is itself aware of members to whom it provided services and subsequently become aware of Fund coverage, the Murphy Practice has not alleged that it reached out to the Fund so that it may submit claims for services provided to these members. The district court correctly found these allegations to be both: (a) irrelevant as to whether the Murphy Practice should be excused from administrative exhaustion, and (b) undermined by the Fund's SPDs that provide information on how to submit a claim for reimbursement. JA.756-757.

## CONCLUSION

Accepting as true all of the Murphy Practice's well-plead allegations, the most logical inference is that the Murphy Practice never attempted to bring any administrative appeals on its patients' behalf because it did not believe it was required to do so, and upon its recognition of the legal significance of this failure, it attempted to circumvent this threshold requirement by relying on vague allegations of its supposed "appeals," while simultaneously grasping at excuses, through similarly vague allegations, that attempt to justify its failure to exhaust the Fund's

administrative process.  If such meager allegations were deemed sufficient for benefit claims under ERISA §502(a)(1)(B) to proceed, the entire purpose of requiring exhaustion of administrative appeals prior to proceeding to litigation would be defeated.

For all of the foregoing reasons, the district court's decision should be affirmed in its entirety.

Dated:          October 17, 2024
                New York, NY

                          Respectfully submitted,


                          By: /s/ Elizabeth R. Chesler
                              Elizabeth R. Chesler
                              1199SEIU Benefit and Pension Funds
                              498 7th Avenue, 10th Fl.
                              New York, NY 10018
                              Tel: 646-473-6042
                              Email: Elizabeth.Chesler@1199funds.org

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that this brief was prepared using Microsoft Word and that according to that software, it contains 8,466 words, not including the table of contents, table of authorities, this certificate, and the cover. This brief complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) of the Federal Rules of Appellate Procedure and Local Rule 32.1.

/s/ Elizabeth R. Chesler